No. 2--05--0826     Filed:  8-24-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 04--CF--2383 |
| IAN F. WASHINGTON, | ) ) ) | Honorable Philip L. DiMarzio, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CALLUM delivered the opinion of the court:

Defendant, Ian F. Washington, was tried by jury for attempted first degree murder (720 ILCS 5/8--4(a) (West 2004)), aggravated battery with a firearm (720 ILCS 5/12--4.2(a)(1) (West 2004)), aggravated discharge of a firearm (720 ILCS 5/24--1.2(a)(2) (West 2004)), and mob action (720 ILCS 5/25--1(a)(1) (West 2004)).  The trial court granted a mistrial on the mob action charge.  On June 24, 2005, the jury found defendant guilty of the remaining offenses.  The trial court denied defendant's motion for a new trial and sentenced defendant to 12 years' imprisonment.  Defendant timely appeals, arguing that: (1) an alternate juror was erroneously substituted for a deliberating juror after the original jury had reached a verdict on one count; (2) the trial court abused its discretion in permitting the introduction of gang-related evidence; (3) defendant's right to confront and cross-examine witnesses was violated; (4) the cumulative impact of trial errors deprived defendant of a

fair trial; and (5) the State failed to meet its burden beyond a reasonable doubt. As we agree with defendant on the fifth issue, we need not reach the others. For the following reasons, we reverse.

## I. BACKGROUND

### A. July 4, 2004

The following evidence was adduced at trial. On July 4, 2004, at around 2 a.m., Cesar Puga drove Jesus Laras to Margarita Salgado's house at 1309 Grand Boulevard in Aurora. Puga pulled his car into a driveway across the street from Salgado's house. Puga heard someone shouting. When he turned around, he saw through his back window that a van was positioned in the street so as to block the driveway behind him. A streetlight made it difficult to see, but Puga believed that the van was gray and dark red. Puga saw a chrome-colored gun pointed at him from the van's driver's window. Puga could not see how many people were in the van, nor whether the individual holding the gun was a man or a woman. He could, however, see that the person's skin color was black. Puga put his hands up and said that he did not want any problems. He turned around to tell Laras that they were in trouble, and the van's occupant fired the gun. Puga's back window broke, and a bullet hit him in the upper part of his left arm. The van drove away. Puga put the car in reverse and drove to his friend Juliana Uribes's house.

While driving Puga to the hospital, Uribes was stopped by the police. Puga told the police officer what had happened, giving a description of the van and the color of the driver's skin, and told the officer that the driver was male, based on the voice that was yelling at him in the driveway. At trial, he recalled the van as being gray with dark red coloring. Puga stayed at the hospital overnight, and a bullet was later removed from his arm. Puga was not a member of a street gang when he was shot.

Margarita Salgado testified that, on July 4, 2004, she was dating Jesus Laras. At around 2 a.m., Salgado was on the telephone when she saw a car drive near her house and pull into the driveway across the street. Wondering who was there, she went outside. A van drove up and stopped behind the driveway, blocking the car's exit. Salgado was not wearing her contact lenses (which she needs to drive). It was dark, and the van was too far away for her to see how many people were in it. Salgado did not hear any shouting or yelling. She heard one noise that sounded like a firecracker but did not think that the noise was a gunshot. After the van left, the car pulled out of the driveway and drove away. About five minutes later, Salgado saw a van being followed by the police that looked like the same van that had blocked the driveway. She conceded that it could have been a different van.

Jesus Laras testified that, before getting into the car with Puga on July 4, 2004, he had "quite a lot" to drink and was intoxicated. He asked Puga to drive him to Salgado's house. When they arrived, Puga pulled his car into the driveway across the street from Salgado's home. Laras was seated in the front passenger seat. When Puga was about to back out, a van was blocking the driveway. Laras recalled that Puga and someone in the van were talking, but he did not know what they were saying. He did not turn to look out the back of the vehicle. Laras was not able to see the person talking from the van, and he was unable to get a good look at the van. He could not say what color the van was or how many people were in the van. Laras heard a single gunshot, and the car's back window broke.

Officer Tunney testified that she had worked for the Aurora police department for four years. On July 4, 2004, at around 2:09 a.m., she observed a vehicle traveling at a high rate of speed in front of her. As she started to catch up with the vehicle, the driver, Juliana Uribes, pulled over and jumped

-3-

out of the car. Uribes said that Puga had been shot and that she was trying to get him to the hospital. Tunney asked Puga where the shooting had occurred and whether he could provide any suspect or vehicle information. Puga told Tunney, through Uribes, who was interpreting Spanish to English, that the vehicle was a gray and black van with an unknown number of male blacks inside. Tunney got on her radio and announced over the air that a shooting had occurred and that an unknown number of black males in a gray and black van were responsible. Tunney then followed Uribes and Puga to the hospital. There, Tunney spoke with Jesus Laras, who told Tunney that he saw a gray and black van pull up behind them in the driveway.

Lorena Hernandez testified that she had been an officer with the Aurora police department for almost three years. On July 4, 2004, at around 2:09 a.m., she responded to Tunney's radio transmission and proceeded to the 1300 block of Grand Avenue. When she arrived at the 1200 block of Grand Avenue, where Grand intersects Sumner Street, she observed a full-sized, "gray over black" van. She pulled behind the van and followed it, advising over the radio of her location and that she was behind a vehicle matching the description of that from the shooting. She then turned on her overhead lights and spotlight and effected a "felony stop." Hernandez agreed that, although Tunney's description appeared to match that of the van in front of her, the van did not do anything unusual or commit any violations during the time that she followed it.

Other squad cars, with at least four other officers, arrived and pulled both in front of and behind the van. All officers had their guns drawn. Hernandez exited her vehicle and noted that the van appeared fully occupied. The van had three rows--the front row with the driver's and passenger's seats, a middle row, and a back row. She called the van's occupants out of the vehicle, one at a time. First, the driver exited the vehicle. He was directed to walk backward toward the officers and was

then handcuffed and taken into custody. The driver was later identified as Lorenzo Ingram. The front passenger was directed to leave the vehicle and was taken into custody. He was later identified as defendant. The individual occupying the middle row of the van was later identified as Dontal Rayford. Finally, the individual occupying the back row was later identified as Jonathan Phillips.

Matthew Hix testified that he had been an officer with the Aurora police department for over six years. On July 4, 2004, at around 2:15 a.m., Hix responded to the felony stop. Hix explained that a felony stop is conducted by holding the vehicle occupants at gunpoint, removing them one at a time, and handcuffing them as the occupants make their way toward the police. Hix identified defendant as one of the individuals who exited the van. Hix searched the van after it was cleared and located a handgun under the backseat closest to the rear door. He described the gun as a black, revolver-type handgun with a white handle. "I guess you would describe it kind of like a cowboy type gun, appeared to be." Hix did not find any chrome-colored guns in the van, nor any shell casings.

After the gun was secured into evidence, Hix interviewed Margarita Salgado and brought her in his squad car to the van's location. When Hix asked Salgado, "Is that the van you saw?" she said yes. At that time, she was seated inside the police car roughly 50 to 75 feet away from the van. He did not ask Salgado whether she wore glasses or contact lenses, nor did he see her put any contact lenses into her eyes before making the identification.

Glenn Casamassimo testified that he had been an officer with the Aurora police department for over six years. Casamassimo arrived at the felony stop and observed that two individuals in the back row of the van, where the gun was eventually found, quickly ducked down toward the van's

floor. Casamassimo later secured the gun, a small, black, .22-caliber revolver with a white handle, and placed it into evidence. There was no chrome on the gun. There were four bullets in the gun and two spent shell casings. There was no way for Casamassimo to know when the gun had last been fired prior to his receiving it to put it into evidence. A check revealed that the gun was not stolen; Casamassimo did not know who was the gun's registered owner.

## B. Accomplice Testimony

### 1. Jonathan Phillips

Jonathan Phillips testified that, on July 3, 2004, at around 9:20 p.m., he was at the Lavillita Liquor Store with two friends. Phillips saw a full-sized, pink and black van, with two Hispanic individuals dressed in black, hooded sweatshirts, circling the area. He was nervous because the individuals looked like gang members and like they were "out to kill." They were driving slowly, and he was alarmed by the fact that they were Hispanic because, in that neighborhood, "most of the Hispanics are Kings." Phillips is affiliated with the Gangster Disciples street gang in Aurora. He testified that the Gangster Disciples and the Latin Kings do not get along and that they "shoot on sight." He told his friends about the van, and they went inside the liquor store. Five minutes later, they left the store and got into their car. They saw the van circling the area again and, as Phillips and his friends were pulling away, the van's passenger began shooting at their car. More than one shot was fired; the back tires were hit, a window shattered, and Phillips was scratched by the glass. After driving away and parking at a gas station, Phillips got out and walked down the middle of the street, shouting and yelling. As he was screaming, a police officer approached him. Phillips provided a statement and then went to his aunt's house, near where the shooting occurred. He stayed there for

an hour or two, changed his clothes, and left to drink and smoke marijuana with some friends. He remained "pissed off" about the shooting.

At some point, defendant pulled up in his van, with Dontal Rayford and Lorenzo Ingram. Phillips had seen defendant's van before, but testified that, on July 3 or 4, 2004, he was not a friend of defendant. He was a friend, however, of Ingram and Rayford. Phillips testified that defendant was driving, Ingram was seated in the passenger seat, and Rayford was in the backseat. Phillips approached the van, eventually climbed in, and relayed what had happened to him at the liquor store. Ingram gave Phillips a hooded sweatshirt and a .22-caliber revolver--black with a white handle--and told Phillips that he "was gonna show [Phillips] how to do this, how to hit 'em." Phillips understood that Ingram was going to show him how to kill some Kings. Defendant did not say much that evening. Defendant then drove through "King hood." Phillips testified that, if he had seen a King member, he would have shot him.

They were drinking alcohol and smoking marijuana while in the van. At some point, everyone in the van spotted on Grand Boulevard in the opposite lane a car with two Hispanics driving toward the van. According to Phillips, defendant was still driving. After the car pulled into a driveway, defendant pulled the van behind the driveway so as to block the car in. Defendant then yelled "KK," meaning "King Killer," toward the car. Defendant grabbed a black, 9-millimeter gun from Ingram's lap and said that the "damn gun better not jam." Defendant fired out of the driver's window one shot that hit the car's back window. After defendant fired, he said that "this damn gun jammed," and he pulled away. Defendant drove back down Grand Boulevard toward Calhoun Street, where he pulled over by his house. Ingram grabbed the gun, jumped out of the van from the front passenger seat, and stashed the gun by defendant's house. Ingram returned to the van and got

into the driver's seat. Defendant jumped into the passenger seat. Shortly thereafter, they were all arrested. When they were pulled over, Ingram was driving. Phillips stashed the .22-caliber revolver under the seat; the revolver was later confiscated.

On cross-examination, Phillips agreed that after the arrest, he, in contrast to his direct testimony, told the police that the van's occupants were not involved in a shooting and that Ingram had been driving the entire evening because defendant was drunk. Phillips testified that everything he told the police in his July 4, 2004, statement was "a lie." Phillips did not tell the police the truth that night because he was not a "snitch," and he intended to remain silent. All of the van's occupants were released without charges. Phillips testified that nobody fired the black, .22-caliber revolver with a white handle that night. Indeed, the crime laboratory's test results ultimately showed that the .22-caliber revolver was not the gun used to shoot Puga. Gunshot residue tests were performed on defendant, Phillips, Ingram, and Rayford. The tests came back negative. The black, 9-millimeter gun that Phillips described was never found.

Phillips was later charged with attempted first degree murder, aggravated battery, and aggravated discharge of a firearm. At the time of trial, Phillips was on felony probation out of juvenile court for possession of a controlled substance. Phillips did not wish to be transferred to an adult prison or tried as an adult. In addition, after he read the statements given by Ingram, Rayford, and defendant, which implicated Phillips in the shooting, Phillips determined that "it's every man for their self." Therefore, in March 2005, Phillips told the State that defendant was driving the van and shot the gun. On April 20, 2005, Phillips entered into an agreement with the State's Attorney's office, in exchange for his testimony, whereby the State agreed not to proceed on a petition to transfer him to adult court. Phillips agreed to plead guilty to aggravated discharge of a firearm, and

the remaining charges were dropped. His sentence under the agreement was 60 months' probation and 30 days in the Kane County Juvenile Justice Center. On cross-examination, Phillips testified that the State repeatedly instructed him to tell the truth. Nevertheless, his understanding was that he could not testify that defendant was innocent and still receive the deal and that, in order to get the deal, he had to testify that defendant shot the gun.

### 2. Dontal Rayford

On July 4, 2004, after being arrested, Dontal Rayford told the police that he was not involved in any shooting that night. At trial, after invoking his fifth amendment right to remain silent and receiving use immunity, Rayford testified that, at the end of the day on July 3, 2004, he was in defendant's van with defendant, Ingram, and Phillips, who was "mad about something."

"Q. And you were basically kind of cruising around in the van with your friends, correct?

A. Yes.

Q. For no particular purpose, except you were just kind of chilling out, correct?

A. Yes.

Q. It was a holiday weekend, wasn't it?

A. Yeah.

***

Q. So, is it fair to say you were relaxing and having a good time?

A. Yeah.

Q. So, you're driving around, smoking and drinking, and there was no particular purpose to that, was there?

Q. Not that I recall.

A. Not that you were aware of?

Q. No."

Rayford testified on direct examination that Ingram was the driver. The State sought to clarify whether it was his testimony that Ingram was the driver, and Rayford confirmed that it was. The State asked whether Rayford recalled giving an audiotaped statement to the police on August 21, 2004. Rayford testified that he did not recall the statement. The State asked whether Rayford recalled that, during that statement, he was asked who was driving when they were cruising around in the van and that, contrary to his testimony on direct examination, he answered that defendant was the driver. Rayford testified that he did not recall. Rayford also did not recall numerous other questions and answers from his August 21, 2004, statement.

The August 21, 2004, taped statement was played for the jury and entered into evidence. In the statement, Rayford said that defendant blocked the car in the driveway with the van and then yelled "King Killer, woo woo, KK" out the window. Rayford heard one gunshot, defendant pulled away, and Phillips came to the back of the van with a gun in his hand. Rayford testified that, in that interview, he was "just going along telling them a story." However, Rayford and the interviewing officer, Greg Spayth, confirmed that he did not tell the police at that time that defendant shot the gun. Instead, Rayford said that he did not know who shot the gun, but that Phillips came to the back of the van with a gun in his hand.

At trial, Rayford testified that, from where he was sitting in the van, he could not see outside very well because the van had curtains on the windows. He did not recall seeing a car with Hispanics in it or even seeing the shooting itself. Rayford testified that he was intoxicated at the

time and that he had been drinking Hennessy and smoking marijuana. They had been driving around for three or four hours--"a long time." Rayford testified again, contrary to his August 21, 2004, statement, that defendant was seated in the front passenger seat and was not driving.

Rayford then testified that, from the back of the van, he could tell that defendant fired the gun. And, even though he had testified that defendant was not driving, he testified that, after shooting the gun, defendant pulled away and drove around, returning to Calhoun Street, where Ingram got out of the van. Rayford lost sight of Ingram for three or four minutes.

According to his August 21 statement, when Ingram returned to the van, he and defendant switched places in the driver's seat. On cross-examination, however, Rayford reverted to his original testimony--that Ingram was driving the van and that Ingram and defendant never switched seats. Rayford confirmed twice that Ingram was driving and that Ingram and defendant never switched seats. Defendant, who was in the front passenger seat, was drunk. Everyone was drunk. Although he had previously testified that he did not recall the shooting, when defense counsel asked him what happened during the shooting, Rayford said "to make the story short, [defendant] did it." Rayford clarified that: they saw the Hispanic men driving in the opposite direction; defendant took out a gun; Ingram stopped the van; and Ingram and defendant began yelling. Then, defendant got up, reached over Ingram, and fired the gun one time. The van took off and drove to the middle of Calhoun and New York Streets, where Ingram got out of the van. Defendant did not get out. Rayford did not see where Ingram went and did not see him carrying anything. When Ingram returned to the van, he got back in the driver's seat and drove away.

The police spoke with Rayford again on April 11, 2005, two months before trial. That taped conversation was also played for the jury and admitted into evidence. Rayford did not remember

telling the police on that date that, when the van pulled over after the shooting, nobody got out of the van, as far as he could see, or stating "um, not that I remember. I was intoxicated. I was drunk." He did, however, remember telling police, "I forget, man. I told you my brain cells are fucked up, man. Smoke too much bud, man." In addition, he recalled saying, "too much weed, my memory's ain't that good." He admitted that he could not otherwise recall what he said to the police two months before trial. Rayford and Spayth both confirmed at trial that Rayford did not state on April 11 that defendant shot the gun.

Rayford was asked why, despite his July 4, 2004, August 21, 2004, and April 11, 2005, opportunities to do so, only at trial was he accusing defendant of shooting the gun. Rayford said it was because he "did not want to go down for what somebody else did." He had no explanation for not telling the police in August 2004 or April 2005 that defendant shot the gun.

After being dismissed, Rayford was later called back to the stand. In a conversation between Rayford and his guardian, "Red," which was taped on April 24, 2004, and was played for the jury and entered into evidence, Rayford told Red that Phillips was "telling" on defendant, that the State had upgraded the charges against Rayford, and that the State was trying to cut a deal with him to tell on defendant. He said that if he did not tell, he would get charged with conspiracy, but, if they worked out a deal, he would get to go home. Red said "but [defendant] did it," and Rayford answered "yeah." Red said,"he's going down anyway, ain't no need for you to go down with him." Rayford confirmed that, at the time of the conversation, he was hoping to get a deal.

At the time of trial, Rayford had charges pending for the July 4, 2004, shooting and was facing at least 6 to 30 years' imprisonment on two charges and 15 years on another charge. He had two prior convictions of possession of a controlled substance and was facing sentencing on those

charges. Also, he was previously adjudicated a delinquent minor in Kane County and had received 24 months' probation. Rayford confirmed that, by smoking marijuana in the van on July 4, 2004, he violated his probation. Although Rayford had no deal with the State to testify and testified that he did not expect to gain anything from his testimony, he conceded that he had a lot at stake.

### 3. Lorenzo Ingram

After invoking his fifth amendment right to remain silent, Lorenzo Ingram was granted use immunity. Thereafter, he testified that defendant is his cousin and friend. On July 3, 2004, Ingram became aware that someone shot at Phillips. At some point, late on July 3 or early on July 4, Ingram joined defendant, Rayford, and Phillips in the van and they drove around smoking and drinking. Ingram testified on direct examination that defendant was driving the van and that Ingram sat in the front passenger seat. Ingram asked Phillips about the earlier shooting; Phillips did not say much about it but was very angry.

They were riding around "as usual," listening to music, smoking, and drinking. When they were driving down Grand Boulevard, Ingram saw a car pulled over and pointed it out to defendant. "And I told [defendant] to pull over. And he was like man, we just riding, man. We ain't trying to holler at anybody, we kickin'. And I told him, man, pull over, I think that's one of my guys ***." Defendant pulled over on the wrong side of the street. Phillips and Rayford walked forward from the back of the van to stand in between defendant and Ingram. Phillips said "they look like some Kings to me," and defendant wanted to drive away. Next, "[Phillips] said no, they're some Kings, they're some Kings, and he shot a round and hit the guys." Defendant drove off and then pulled over, telling Phillips to get out of the van. Ingram and defendant then switched places as drivers. The State asked Ingram:

"Q. When you knew there was a gun in the car, are you guys looking for someone to get, specifically Kings?"

A. No. That wasn't even a part of the night. It was--we was just riding and kicking' and drinking and smoking.

***

Q. And specifically where did you guys go looking for Kings at?

A. We just was riding around. But Jonathan, when he said--he said that, you know what I'm saying, that he had a pistol. But we didn't believe him. Because we was all drinking. And who was gonna go do something under the influence.

Q. So, you knew that he was looking for Kings, is that correct?

A. Yes, but--

Q. It's a yes or no question.

A. Yes.

Q. And in response to my question, where did you guys go looking for Kings.

A. We just rode around. We wasn't really looking for no Kings."

The State later asked Ingram what they were going to do if they came across a King, and he said that Phillips said that he might try to shoot one. Phillips was seated in the backseat, behind defendant.

The State introduced a prior statement that Ingram gave to the police on August 12, 2004, wherein he explained that they had been driving around and, when they saw two "guys" pulling into a driveway, defendant pulled up and blocked the car in the driveway. Defendant asked the car's occupants if they were Kings. Phillips said that they were Kings, reached over defendant's shoulder, and shot one time. Spayth later confirmed that, in his interview with Ingram on August 12, 2004,

Ingram stated that Phillips fired the gun. In that interview, when asked, "Did you guys know that [Phillips] was looking for somebody to get, you know, looking for Kings[?]--" he answered "yeah."

On cross-examination, Ingram conceded that, on July 4, 2004, he told the police, in contrast to his testimony on direct examination, that <u>he</u> had been driving because defendant was intoxicated. On December 30, 2004, while Ingram was in custody, an investigator for defendant, Arnoldo Castillo, came to the jail to speak with him. Ingram confirmed to Castillo that he was driving the van because defendant was drunk. Ingram did not recall telling Castillo that he would not testify against his cousin. However, the State and defendant stipulated that, if called to testify, Castillo would state that, on December 30, 2004, Ingram told him that he would not "trick" on his cousin.

On redirect examination, the State asked Ingram whether it had been his testimony on direct examination that defendant was driving the van when they came across the car in the driveway and during the shooting. Ingram confirmed that it was.

"Q. And that--so I'm making sure I understand, that was in response to my question today, correct?

A. I guess, yes.

Q. It wasn't in response to what you said on August 12, 2004, it's what I asked you today, correct?

A. I guess so, I'm not sure."

Ingram then testified, however, that defendant was driving <u>after</u> the shot was fired and the van pulled away, prompting the following colloquy:

"Q. My question is right now you just had the both of you driving at approximately 2:00 in the morning of July 4, 2004, is that correct?

A. I'm not sure if he was driving at that time.

Q. You just testified that this was your memory that he was driving at the time the shots were fired, is that correct?

A. It was a few times he was driving, so the times, you know, I'm trying to--I'm trying to understand and remember much as I can.

Q. In relation to shots being fired out of [defendant's] van, how many shots were fired out of his van on that July 4, 2004 period?

A. One.

Q. And at the time the shot was fired, who was driving that van?

A. [Defendant]."

Ingram recalled that he had testified that what he told the police on July 4, 2004--that he had been driving because defendant was intoxicated--was the truth. In response to the question, "Are there so many lies in this case that you don't even know what the truth is anymore?" Ingram answered, "I know that Jonathan Phillips shot at those guys, I know that." Ingram had no deal with the State for his testimony.

### C. Remaining Witnesses

Steve Stemmet testified, over defendant's objection, that he was a narcotics detective for the City of Aurora. He previously worked in the gang unit. On December 20, 2001, he responded to a shooting at a bar and liquor store. Defendant was the person who had been shot; he had been shot in the face by three or four Hispanic males. Aurora police officer John Thompson testified that

defendant described the shooters. Thompson asked if they had gang affiliations, and defendant told him that he thought one shooter was a Latin King. Over objection, Thompson testified that, in 2001, defendant admitted hanging around with the Gangster Disciples.

Over defendant's objection, the State called Jeff Wiencek as a gang expert. Generally, Wieneck described the Aurora gang culture, including known gangs, their hierarchies of leadership, and their territories, dress, signs, and rivalries. More specifically, Wiencek explained that some gangs are at war with one another and are self-professed killers of one another. In Latin King graffiti it is common to find "GD killer"; in Maniac Latin Disciple graffiti it is common to find "KK" or "King Killer." In Wiencek's opinion, as of July 4, 2004, Ingram was a member of the Maniac Latin Disciples, Phillips was a member of the Gangster Disciples, Rayford was a member of the Insane Deuces, and defendant was a member of the Gangster Disciples. In the summer of 2004, the Gangster Disciples, Insane Deuces, and Maniac Latin Disciples were all at war with the Latin Kings.

The State rested. Defendant's motion for a directed verdict was denied. Defendant called Officer Timothy Jones to the stand. Jones testified that, on July 4, 2004, he spoke with Phillips at the police station. Phillips told him that, when he entered the van, Ingram was driving and defendant was in the front passenger seat. Defendant rested.

The trial court granted a mistrial on the mob action count, and the jury returned guilty verdicts on the three remaining charges. Defendant's motion for a new trial was denied. The trial court sentenced defendant to 12 years' imprisonment for attempted first degree murder, finding that the two other convictions merged into the first. Defendant timely appeals.

## II. ANALYSIS

At trial, the State argued that defendant could be found guilty if he committed the acts or, based on an accountability theory, if the acts were committed by one for whose conduct he was legally responsible. The jury was instructed that this accountability concept meant that defendant was legally responsible for the conduct of another if he, with the intent to promote or facilitate the commission of an offense, knowingly aided, abetted, agreed to aid, or attempted to aid the other person in the commission of the offense. See 720 ILCS 5/5--2(c) (West 2004). The State argued that defendant was guilty because he was the person who shot Puga. Alternatively, the State argued that defendant was guilty on an accountability theory because he was the driver of the van when Puga was shot and, thus, aided the shooter in committing the offenses. The State contends that it proved its case beyond a reasonable doubt on both points. On appeal, defendant argues that the State failed to meet its burden because it did not prove either point beyond a reasonable doubt. He asserts that the State provided no objectively verifiable evidence that he fired the shot (e.g., ballistics evidence, gunshot residue evidence, DNA or fingerprint evidence, hair or trace element evidence, or the gun itself), nor did objective eyewitnesses identify defendant as either the shooter or the driver. Instead, "the State relied almost exclusively on the purchased testimony of alleged co-conspirators who received sweetheart deals." He notes that even the alleged coconspirators' testimony was conflicting on critical points. We agree.

When a defendant argues that the evidence was insufficient to sustain his conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. People v. Collins, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, we will not retry the defendant. People v. Smith, 185 Ill. 2d 532, 541 (1999). It is the jury's function to assess witness credibility,

weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. People v. Williams, 193 Ill. 2d 306, 338 (2000). Nevertheless, while the jury's findings regarding witness credibility are entitled to great weight, the jury's determination is not conclusive. Smith, 185 Ill. 2d at 542. The appellate court will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. Smith, 185 Ill. 2d at 542.

We begin by considering the evidence that defendant shot Puga. There was no objective evidence submitted at trial regarding who shot Puga. In fact, the only gun found was not the gun used in the shooting, and the gunshot residue analysis performed on defendant came back negative. Thus, the State's only evidence regarding whether defendant shot Puga consisted of eyewitness testimony. The objective eyewitnesses, Puga, Salgado, and Laras, testified that they did not see who fired the shot. Puga testified only that he saw a gun pointed at him from the van's driver's window, but he could not identify defendant as the shooter. Defendant's three alleged accomplices, Rayford, Ingram, and Phillips, testified inconsistently regarding who shot the gun.

On July 4, 2004, Rayford denied any involvement in a shooting. In two later, pretrial statements that were admitted as substantive evidence, Rayford did not identify defendant as the shooter. In his August 2004 statement, Rayford specifically stated that he did not know who shot the gun but that, after the shooting, Phillips came to the back of the van with a gun in his hand. In an April 24, 2004, taped conversation, Rayford's guardian commented, "but defendant did it," and Rayford answered "yeah." At the time of that conversation, Rayford was hoping to get a deal from the State, and his guardian stated that, if defendant was "going down," there was no reason for Rayford to go down with him. At trial, Rayford testified that he did not recall the shooting and

confirmed that he had previously stated that his memory was severely impaired because of drug use and that he could not recall statements that he had made even two months earlier. He testified that he was intoxicated and smoking marijuana when the shooting occurred. Rayford then testified that defendant was the shooter and that "to make the story short, [defendant] did it" by reaching over Ingram, who was seated in the driver's seat, and shooting out the driver's window. Thus, Rayford's testimony at various times was that there was no shooter, he did not remember the shooting, he did not know who was the shooter but Phillips had the gun, and defendant was the shooter. Rayford, who was also facing charges for the July 4, 2004, shooting, and was facing serious penalties if convicted, admitted that he had "a lot to lose" and that he was stating for the first time at trial that defendant was the shooter, because "he did not want to go down for what somebody else did." Rayford testified after receiving use immunity from the State.

The remaining testimony, from Jonathan Phillips and Lorenzo Ingram, was at odds. After his arrest, Phillips testified that there was no shooting. After realizing that he was being implicated by the other van passengers and that "it's every man for their self," Phillips told the State that defendant, the only person in the van with whom he was not previously acquainted, was the shooter. Phillips received a significant deal from the State in exchange for his testimony; he was not charged as an adult and he received probation for one charge, and the remaining charges were dropped. In contrast, Ingram, who did not have a deal with the State, consistently asserted in his pretrial statements and at trial that Phillips fired the shot. However, Ingram is defendant's cousin and, according to Castillo, said that he would not "trick on his cousin." Ingram testified at trial only after receiving use immunity from the State.

-20-

The evidence regarding whether defendant was driving the van when the shooting occurred was also inconsistent. Again, there was no objective evidence regarding this point and there were serious discrepancies in the alleged accomplices' testimony. On direct examination, Rayford testified that Ingram was driving. On cross-examination, Rayford confirmed multiple times that Ingram was the driver and that Ingram and defendant never changed seats. In his August 21, 2004, statement, however, which was admitted as substantive evidence, Rayford stated that defendant was driving.

Ingram's testimony on this key point was also inconsistent. On direct examination, Ingram stated that defendant was driving at the time of the shooting. In an August 12, 2004, statement to the police, Ingram also stated that defendant was driving. However, on cross-examination, Ingram agreed that, on July 4, 2004, he told the police that he had been driving because defendant was drunk and that this statement was the truth. He also agreed that, in December 2004, he told Castillo that he, not defendant, was the driver. On redirect examination, however, Ingram could not decide what to say, confirming first that defendant was the driver during the shooting and then testifying that defendant was the driver after the shooting.

As to Phillips, when arrested on July 4, 2004, he told the police that Ingram had been driving the entire evening because defendant was drunk. At trial, he testified that defendant was driving.

It is our duty, when carefully examining the evidence, to give due consideration to the fact that the court and the jury saw and heard the witnesses. See Smith, 185 Ill. 2d at 541. If, however, after such consideration, we are of the opinion that the evidence was insufficient to support the defendant's guilt beyond a reasonable doubt, we must reverse the conviction. See Smith, 185 Ill. 2d at 541. Here, the only evidence linking defendant to culpable involvement as either the shooter or

the driver is the testimony of his three alleged accomplices. Our supreme court has emphasized that accomplice testimony is " 'fraught with serious weaknesses such as the promise of leniency or immunity and malice toward the accused' [citation], and should therefore be accepted only with utmost caution and suspicion and have the absolute conviction of its truth." People v. Newell, 103 Ill. 2d 465, 470 (1984), quoting People v. Wilson, 66 Ill. 2d 346, 349 (1977); see also People v. Ash, 102 Ill. 2d 485, 493 (1984); People v. Baynes, 88 Ill. 2d 225, 232 (1981). Moreover, a jury's finding of witness credibility may be set aside in the face of serious inconsistencies and repeated impeachment of testimony. See, e.g., Smith, 185 Ill. 2d at 545; People v. Schott, 145 Ill. 2d 188, 206-07 (1991); People v. Williams, 65 Ill. 2d 258, 266-67 (1976).

In concluding that the accomplice testimony here failed to establish defendant's guilt beyond a reasonable doubt, we find Newell instructive. There, the defendant and three accomplices were indicted on burglary charges. The defendant was charged on an accountability theory. One of the defendant's accomplices, Barnes, provided a statement to the police that implicated the defendant and the other accomplices. Barnes was subsequently granted immunity from prosecution in exchange for his agreement to testify. At trial, Barnes testified consistently with his prior statement as to the defendant's participation in the crime, and his testimony was the only evidence connecting the defendant to the crime. The other two accomplices corroborated Barnes's testimony with respect to the events surrounding the actual commission of burglary. However, their testimony flatly contradicted Barnes's testimony regarding the defendant's involvement in the crime. The jury found the defendant guilty, and the appellate court reversed.

Our supreme court affirmed, holding that Barnes's testimony simply failed to remove all reasonable doubt of the defendant's guilt. Newell, 103 Ill. 2d at 470. The court found that, in

addition to Barnes's receiving immunity, his testimony regarding the defendant's participation was wholly uncorroborated and directly contradicted by the other accomplices in material respects. Newell, 103 Ill. 2d at 471. The court applied the holding in People v. Hermens, 5 Ill. 2d 277, 286 (1955), where the uncorroborated testimony of an accomplice implicating the defendant was contradicted by the defendant and a second accomplice. There, the court held that "the testimony of the defense witnesses was entitled to as much weight as the testimony of the accusing accomplice 'and where other accomplices support defendant's denial the defendant's guilt [is] not established beyond a reasonable doubt.' " Newell, 103 Ill. 2d at 470, quoting Hermens, 5 Ill. 2d at 286. The court acknowledged that great weight is given to the jury's judgment on credibility questions, but that its judgment will be reversed if the evidence is insufficient to remove all reasonable doubt of a defendant's guilt and to create an abiding conviction that he or she is guilty of the crime charged. Newell, 103 Ill. 2d at 470. Moreover, the court acknowledged that Barnes made his statement implicating the defendant before receiving immunity, and that the two other accomplices may have been prompted to contradict Barnes because his statement also implicated them. "But where the only evidence is the testimony of three accomplices, all convicted felons, one of whom says defendant is guilty and two of whom say he is not, with no corroboration of either view, we simply cannot say there has been proof of guilt beyond a reasonable doubt." (Emphasis in original.) Newell, 103 Ill. 2d at 471.

Thus, the court in Newell held that reasonable doubt was present, even though the jury heard consistent testimony from Barnes and even though the other accomplices corroborated certain portions of Barnes's testimony. Where, as here, the accomplices differed on the critical issue of the defendant's involvement in the crime, the jury verdict was reversed. We acknowledge that, to some

extent, Newell has been limited to its facts. See, e.g., People v. Rivera, 166 Ill. 2d 279, 288 (1995). Nevertheless, other courts have reversed jury convictions on account of a failure to establish the truthfulness of an accomplice's testimony. See, e.g., Ash, 102 Ill. 2d at 494-95; Williams, 65 Ill. 2d at 266-67; People v. Taylor, 219 Ill. App. 3d 47, 50 (1991); People v. Gnat, 166 Ill. App. 3d 107, 110-11 (1988).

Here, we simply cannot say that the evidence was sufficient to create an "abiding conviction" that defendant was either the shooter or the driver. See, e.g., Newell, 103 Ill. 2d at 470. There was no objective corroboration, no credible testimonial corroboration, and no absolute conviction of truth in the testimony so as to support defendant's guilt. See, e.g., Newell, 103 Ill. 2d at 470-71. Even if two of the alleged accomplices corroborated one another on one pertinent issue, they subsequently contradicted one another on others. See, e.g., Williams, 65 Ill. 2d at 267. For example, although at various points both Rayford and Phillips identified defendant as the shooter, they contradicted each other on the critical issue of who was driving when the shooting occurred. At various points, both Phillips and Ingram identified defendant as the driver, but they contradicted each other as to who fired the gun. At various points, both Ingram and Rayford placed Ingram as the driver, but then disagreed as to whether defendant was the shooter. The result was that there was no remotely consistent account of the events that occurred on July 4, 2004, or defendant's role in them. Thus, there is reasonable doubt as to defendant's guilt.

The dissent attempts to distinguish Newell by asserting that, there, only one accomplice tied the defendant to the burglary, whereas, here, all three alleged accomplices placed defendant at the scene and identified him as either the driver or the shooter or both. This ignores the fact that, at various times, all three alleged accomplices completely contradicted one another in their depictions

of defendant's role in the crime. Thus, as in Newell, there is no credible corroboration of defendant's culpability.

The dissent further asserts that, based on Phillips' testimony alone, the jury could have concluded that defendant, regardless of whether he was the driver or the shooter, was part of a common design to avenge the altercation in which the Kings shot at Phillips and, thus, he was accountable. First, it is true that even the uncorroborated testimony of a single witness can be sufficient to convict if the testimony is positive and credible. See, e.g., Smith, 185 Ill. 2d at 545. "Whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury." Wilson, 66 Ill. 2d at 349. Nevertheless, it bears repeating that accomplice testimony should be accepted with utmost caution and suspicion. See Newell, 103 Ill. 2d at 470. The dissent contends that our holding here substitutes our judgment for the jury's. We note that the cases it cites for this proposition also contained significant corroborating evidence of the challenged witnesses' testimony. See People v. Tenney, 205 Ill. 2d 411, 430 (2002); People v. Holmes, 141 Ill. 2d 204, 242-43 (1990). Regardless, we emphasize that we have, of course, proceeded with respect for the jury's function and are duly mindful of its role. Nevertheless, where it is apparent that the defendant was not proved guilty beyond a reasonable doubt, we will set aside the conviction. Wilson, 66 Ill. 2d at 349. Given that the witnesses here, including Phillips, were either thoroughly incredible or impeached and that there was no objective evidence implicating defendant, we find, viewing the evidence in the State's favor, that no rational jury could have found defendant guilty beyond a reasonable doubt.

Moreover, the dissent erroneously implies that, for purposes of accountability, defendant's specific role in the crime is immaterial. The dissent notes that defendant does not contend that he

was not present, that his van was not involved, or that the shot was not fired by someone in his van. However, as seen below, none of these factors is necessarily sufficient to uphold an accountability finding. Moreover, the dissent's characterization of defendant's argument--that the shooting was based on another passenger's personal, rather than on a unified, motive--as merely an attempt to minimize his role in the shooting ignores the fact that this distinction is critical.

A defendant may be found guilty on an accountability theory if the State establishes beyond a reasonable doubt that the defendant shared the criminal intent of the principal or that there was a common criminal design. People v. Perez, 189 Ill. 2d 254, 266 (2000). A defendant's intent may be inferred from the nature of his or her actions and the circumstances surrounding the criminal conduct. Perez, 189 Ill. 2d at 266. Words of agreement are not necessary to establish a common purpose to commit a crime, and accountability may be established through a defendant's knowledge of and participation in the criminal scheme, even though there is no evidence that he or she directly participated in the criminal act itself. Perez, 189 Ill. 2d at 267.

It is true that evidence that a defendant was present at the scene, fled the scene, maintained a close affiliation with his companions after the crime, and failed to report the crime, may all be considered in determining the defendant's legal accountability. See People v. Taylor, 164 Ill. 2d 131, 141 (1995). However, our supreme court has made clear that mere presence of a defendant at the scene of a crime, even when joined with flight from the crime or knowledge of its commission, is insufficient to establish accountability. Perez, 189 Ill. 2d at 268; see also People v. Shaw, 186 Ill. 2d 301, 323 (1998). "Accountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offenses." (Emphasis in original.) Perez, 189 Ill. 2d at 268. "Thus, '[u]nless the accomplice intends to aid the commission

-26-

of a crime, no guilt will attach.' " (Emphasis in original.) Perez, 189 Ill. 2d at 268, quoting Shaw, 186 Ill. 2d at 322.

At oral argument, the State focused on defendant's participation in a common criminal design, arguing that three men (defendant, Ingram, and Rayford) picked up a younger man (Phillips) and went driving around Aurora looking for someone to shoot. The State did not, however, explain what evidence showed, beyond a reasonable doubt, that defendant intentionally aided in or encouraged this design to drive around looking for someone to shoot. If we set aside the inconsistent, incredible testimony regarding defendant as the driver or the shooter, we have nothing evidencing his intentional aiding or abetting of the crime. See Perez, 189 Ill. 2d at 268-69 (accountability conviction reversed where the evidence was insufficient to establish that the defendant knew his companion was armed or saw signs of impending violence); see also People v. Estrada, 243 Ill. App. 3d 177, 184-85 (1993) (conviction on accountability theory reversed in the absence of evidence establishing that the defendant was aware that his companion intended to shoot the victim or tying him to a common design to shoot the victim); Taylor, 219 Ill. App. 3d at 50 (accountability conviction reversed where State did not prove that the defendant knowingly participated in a common scheme to commit a criminal act when he drove around with friends who dropped concrete from an overpass, killing a motorist); cf. People v. Williams, 193 Ill. 2d 306, 339-40 (2000) (accountability conviction affirmed where evidence that the defendant intended to participate in the common design of murder included her planning the offense, attempting to obtain a gun in the weeks preceding the murders, informing people she was carrying a baby with the name of the victims' son, and subsequently telling people that the victims' son was hers); People v. Anderson, 367 Ill. App. 3d 653, 672 (2006) (where the evidence established that the defendant

intended to participate in the common design of shooting into a house by chasing the victim and securing the area so shots could be fired, accountability conviction affirmed).

Accordingly, the dissent's reliance on People v. Cooper, 194 Ill. 2d 419, 434-35 (2000), is misplaced. As the dissent notes, in Cooper, accountability convictions of aggravated battery with a firearm were upheld, even though the identity of the principal was unknown, because the evidence established that the defendants voluntarily attached themselves to a group bent on illegal activity when they, armed with weapons, joined fellow gang members in rival gang territory and actively participated in a shooting. Both of the defendants were seen shooting their weapons at rival gang members. Cooper, 194 Ill. 2d at 432. Accordingly, as evidenced by Cooper and the cases cited above, accountability convictions have been affirmed when the records reflect affirmative conduct that clearly evidences the defendants' intent to further the crimes. We do not believe that the record here contains any similar evidence to establish beyond a reasonable doubt that defendant intended to aid or encourage the commission of the July 4, 2004, shooting. For example, there is no evidence that defendant planned the shooting, provided a gun, or knew that there was a gun in the van. There is no evidence establishing that defendant discussed shooting Kings, heard the conversation between Ingram and Phillips, or even discussed the shooting Phillips had earlier experienced. Indeed, Phillips testified that defendant did not say much of anything that evening. Although Phillips testified that Ingram said he was going to show Phillips how to "hit 'em," he did not testify that defendant said anything similar or even heard their conversation. Rayford testified that the van's occupants were driving around relaxing with no real purpose and that they were driving around for three or four hours. There is no evidence to reflect that, at any point throughout this extended period of time, defendant shared an intent to shoot someone. While Ingram testified inconsistently as to whether

they were driving around with the purpose of finding Kings, he testified that, when they pulled over behind Puga's car, defendant said, "[w]e ain't trying to holler at anybody, we kickin'," and wanted to leave. That evidence would reflect that defendant did <u>not</u> share in a common purpose to shoot someone.

### III. CONCLUSION

Essentially, when the evidence is viewed collectively, we are left with no idea as to defendant's role in, let alone his intent to encourage or aid, the July 4, 2004, shooting. That being the case, the State did not meet its lofty burden of establishing guilt beyond a reasonable doubt. All that is known beyond a reasonable doubt is that defendant was present and that he was in the passenger seat of the van when it was pulled over by the police. Mere presence at the scene, even with knowledge of the crime and flight after the crime, is insufficient to establish accountability. See <u>Perez</u>, 189 Ill. 2d at 268. We do not, therefore, believe that the evidence was sufficient to sustain defendant's conviction on an accountability theory. We conclude by noting that courts do not find people guilty or innocent, only guilty or not guilty. See <u>Smith</u>, 185 Ill. 2d at 545. Our holding here simply indicates that the State failed to satisfy its burden of proof and we express no view as to defendant's innocence. For the foregoing reasons, the judgment of the circuit court of Kane County is reversed.

Reversed.

BYRNE, J., concurs.

JUSTICE BOWMAN, dissenting:

I respectfully dissent. I disagree with the majority's conclusion that the State failed to prove beyond a reasonable doubt that defendant was <u>either</u> the shooter or the driver in the July 4, 2004,

shooting incident. Even if defendant was not the shooter, the evidence presented by the State was sufficient to prove defendant guilty under an accountability theory.

A person is legally accountable for another's criminal conduct when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5--2(c) (West 2004); People v. Perez, 189 Ill. 2d 254, 266 (2000). To show that the defendant possessed the intent to promote or facilitate the crime, the State must present evidence that establishes beyond a reasonable doubt that either: (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design. Perez, 189 Ill. 2d at 266. "The 'common design' rule provides that where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." People v. Cooper, 194 Ill. 2d 419, 434-35 (2000). Proof of the common criminal purpose or design need not be supported by words or agreement, but may be drawn from the circumstances surrounding the commission of the unlawful conduct. Cooper, 194 Ill. 2d at 435. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." Cooper, 194 Ill. 2d at 435. Moreover, "[a] conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group." Cooper, 194 Ill. 2d at 435. "Upon review of a question as to a defendant's accountability for an offense, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Cooper, 194 Ill. 2d at 424-25.

While the majority states that "we are left with no idea as to defendant's role in" the July 4 shooting, this is simply not true. Slip op. at 29. In this case, defendant does not argue that his van was not involved or that the shot was not fired by someone in his van. Indeed, at oral argument, the appellate defender admitted that he was not arguing that defendant was not present at the scene of the crime. Rather, the appellate defender attempted to minimize defendant's role in the shooting by arguing that one of the passengers carried out a revenge shooting based on a personal, rather than a unified, motive. However, all three accomplices identified defendant's role as either the shooter or the driver or both. As the State argued during closing argument, it does not matter whether defendant pulled the trigger or drove the van; either way, there is sufficient evidence to sustain his conviction. Thus, even if the majority is correct that there was insufficient evidence to show that defendant was the shooter, there was sufficient evidence to support his conviction based on accountability. See Cooper, 194 Ill. 2d at 435 (a defendant may be found guilty under an accountability theory even though the identity of the principal/shooter is unknown). In other words, the evidence that defendant drove the van and blocked in the other car where the victim was shot was enough to show beyond a reasonable doubt that he aided the shooter in committing the offense.

In concluding that the evidence was insufficient to sustain defendant's conviction on an accountability theory, the majority incorrectly sets aside the accomplice testimony. According to the majority, defendant's three accomplices, Rayford, Ingram, and Phillips, testified inconsistently regarding who shot the gun and who was driving, and they were "either thoroughly incredible or impeached." Slip op. at 25. While it is true that the testimony of an accomplice witness has inherent

weaknesses and must be cautiously scrutinized on appeal, "these 'inherent weaknesses' affect questions of the weight of the evidence and the credibility of the witness, matters <u>peculiarly within the province of the trier of fact</u>." (Emphasis added.) <u>People v. Holmes</u>, 141 Ill. 2d 204, 242 (1990). In my opinion, the majority invades the province of the jury, whose function it is to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. <u>People v. Tenney</u>, 205 Ill. 2d 411, 428 (2002). It is the trier of fact who resolves conflicts or inconsistencies in the evidence, and this court will not substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses. See <u>Tenney</u>, 205 Ill. 2d at 427-28 (the defendant's argument that the evidence was insufficient because the testimony of his accomplice was confused, conflicted, unworthy of belief, and substantially impeached addressed functions of the jury and not of the reviewing court).

By substituting its judgment for the jury's, the majority discounts the testimony of Phillips, whose testimony alone was enough to establish defendant's guilt. The testimony of an accomplice witness, whether corroborated or not, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt. <u>Holmes</u>, 141 Ill. 2d at 242. In this case, Phillips' testimony, which I summarize below, was sufficient to sustain defendant's conviction. Contrary to the majority's assertion, Phillips provided evidence that defendant and his accomplices were acting in concert in order to avenge the earlier shooting against Phillips by a rival gang. Based on Phillips' testimony, which identified defendant as both the driver and the shooter, there was sufficient evidence for a rational trier of fact to find defendant guilty, at the very least, of attempted first-degree murder based on accountability. See <u>Cooper</u>, 194 Ill. 2d at 435-36 (although the trial court did not make a finding as to which of the defendants shot the victim, the evidence, viewed in

the light most favorable to the State, established that the defendants were acting in concert in order to retaliate against a rival gang; both of the defendants voluntarily attached themselves to a group bent on illegal activity when they, armed with weapons, joined fellow gang members in rival gang territory, actively participated in shooting at the rival gang, fled from the scene, and failed to report the crime to police); see also People v. Taylor, 164 Ill. 2d 131, 141 (1995) (proof that the defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, that he fled the scene, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability).

At trial, Phillips offered the following testimony. Around 9 p.m. on July 3, he had been shot at by an occupant of a van with two Hispanics. Phillips thought that the Hispanics were "King" gang members who were "out to kill." Phillips was a Gangster Disciple, a gang that did not get along with the Kings, and both gangs "shoot on sight." The Hispanics fired shots at the car Phillips was in, breaking the glass, flattening the tires, and resulting in cuts on Phillips' face. After the incident, Phillips got out of the car and started screaming in the middle of the street. Friends and relatives in the neighborhood heard what happened, and later that evening, defendant, Ingram, and Rayford picked Phillips up in defendant's van.[1] Defendant was driving, Ingram was in the passenger seat, and Rayford was in the back. Phillips sat next to Rayford, behind defendant. After he got in the van,

---

[1]Regarding Phillips' familiarity with defendant, the majority asserts that defendant was "the only person in the van with whom he was not previously acquainted." Slip op. at 20. This finding is not borne out by the record, however, which indicates that Phillips was familiar with defendant and defendant's van.

Phillips told everyone that he had been shot at by Kings. Ingram told Phillips that he was going to show Phillips how to "hit 'em," which meant kill some Kings. Ingram then gave Phillips a hooded sweatshirt that contained a .22-caliber revolver, a gun that Phillips had seen before. Defendant drove "[t]hrough King hood," at a "slow pace." No one needed to give defendant directions to get to "King hood." They were drinking and smoking marijuana as they drove around. They were looking out the window for Kings, but did not find any. Eventually, they left "King hood" and drove toward the east side to find some Kings.

On the way, everyone in the van spotted on Grand Avenue a car with two Hispanics. The car pulled into a driveway and defendant stopped in front of the driveway, blocking the car in. Defendant yelled "KK," meaning "King Killer" or "kill some Kings." Phillips could hear a voice in reply but could not understand what was said. Defendant then grabbed a 9-millimeter gun from Ingram's lap and said "this damn gun better not jam." Defendant fired one shot out the driver's window, shattering the back window of the other car and causing one of the Hispanics to jump. After firing one shot, defendant said, "this damn gun jammed," and he drove away. Next, defendant drove to his house, and Ingram jumped out of the van and stashed the gun somewhere on the side of defendant's house. When Ingram got back in the van, he sat in the driver's seat and defendant jumped into the passenger seat. After Ingram drove down a few streets, the police pulled the van over. Phillips stashed the .22-caliber revolver under the seat and it was confiscated by police. On cross-examination, Phillips testified that the Hispanic victim shot by defendant was innocent and not a King. Nevertheless, Phillips would have shot a King if he had seen one that night.

The majority points out that Phillips initially told police on July 4 that Ingram had been driving the entire evening because defendant was drunk, whereas, at trial, he testified that defendant

was driving. As stated, it is the trier of fact's responsibility to resolve conflicts in the evidence, and this was Phillips' only inconsistency. Moreover, Phillips explained why he lied to the police on July 4 and why, at first, he denied any knowledge of the shooting. Phillips initially told police that Ingram had been driving, because he "didn't want anybody to go away for a long time." When Phillips read the statements the others made to the police, he thought they were "crazy." The shooting "was put off on" Phillips, and Ingram and Rayford were saying that he was the shooter. Before he read the reports, Phillips was prepared to go to trial and remain silent, because he "wasn't raised to be no snitch." He lived by the code of: "Not saying nothing. They ain't got no evidence on nobody. So, everybody keep their mouth shut." Phillips expected everyone to keep quiet, but when he saw the reports, the others were not keeping their mouths shut and it was "every man for their self." Phillips also explained that when all four of them were arrested on July 4, Phillips was placed in a different cell from defendant, but they were not far apart. Defendant yelled that Phillips should take the heat for the gun found in the van, which is called "dry snitching" because defendant said this loud enough for the police officers to hear. Thus, although Phillips tried to "remain silent" in the beginning, he testified that his trial testimony was the truth.

The majority also points out that Phillips received a significant deal from the State in exchange for his testimony. However, the fact that an accomplice is a self-confessed criminal and expects leniency does not, of itself, raise a reasonable doubt. People v. Jackson, 145 Ill. App. 3d 626, 639 (1986). The existence of a promise of leniency goes to the credibility of the witness and his testimony, not to its admissibility; thus, an agreement is not a sufficient reason for an accomplice's testimony to be unworthy of belief, especially where the jury has resolved the issue of credibility by its verdict. Jackson, 145 Ill. App. 3d at 639; see also Tenney, 205 Ill. 2d at 428 (having

heard the accomplice's testimony, the jury was fully aware of his criminal background and of his agreement with the State, and it was the jury's function to decide whether there was a reasonable doubt as to the defendant's guilt). I note that when cross-examined regarding his agreement with the State, Phillips repeatedly testified that he would get the "deal" only if he told the truth.

Although Phillips' testimony alone was sufficient to sustain defendant's conviction, there was additional accomplice testimony implicating defendant. As previously mentioned, I do not agree with the majority that, based on the accomplice testimony, "there was no remotely consistent account of the events that occurred on July 4, 2004, or defendant's role in them." Slip op. at 24. As inconsistent as Rayford's and Ingram's testimony was, it consistently identified defendant's role in the July 4 shooting as either the driver or the shooter.

At trial, Rayford testified that defendant fired the shot and then drove away. On direct examination, Rayford provided conflicting testimony that Ingram was the driver, not defendant. In addition, Rayford did not remember much of a taped statement to police on August 21, 2004, in which he stated that defendant was the driver on July 4, 2004. According to his taped statement, they were driving around in defendant's van and drinking and smoking marijuana. A silver car with Hispanics pulled into a driveway. Defendant then "reversed, blocked them off, lay [sic] out the window, 'King Killer, woo woo, KK.' " Rayford heard one gunshot but did not identify the shooter. After that, defendant and Ingram switched seats and then the police pulled the van over shortly thereafter. In his April 11, 2005, statement to police, which he also did not recall giving, Rayford stated that defendant and Ingram switched seats in front of defendant's house.

On cross-examination, Rayford testified that the four of them were driving around in the van with no particular purpose, and all of them were drunk. Ingram was driving the van the entire time,

and he never switched seats with defendant. Rayford further stated that there was a shooting and that "[t]o make the story short, [defendant] did it." Defendant used a different gun from the .22-caliber revolver. When the Hispanics pulled into the driveway, Ingram stopped the van and Ingram and defendant "got to yelling." Then, defendant reached over Ingram, who leaned back, and defendant fired the gun one time. Rayford did not know where the gun used by defendant came from. The van took off, eventually stopped, and Ingram alone got out of the van. When Ingram returned, he "hit the block" and "passed the scene of the crime." When the police pulled the van over, Phillips threw the .22-caliber revolver in Rayford's lap.

Rayford also admitted on cross-examination that after his arrest he denied any involvement in the shooting on July 4. After the July 4 shooting, Rayford was in jail on a drug charge when the police came to question him on August 21, 2004. Although the police lied to him and said that tests revealed that the .22-caliber revolver was used in the shooting, Rayford knew that the .22-caliber revolver was not used in the shooting; he could not be tricked into saying that it was. Rayford admitted that his memory was not very good due to his drug use. Multiple charges were pending against Rayford in connection with the July 4 shooting, and he did not expect to gain anything from his testimony. When asked if the State would give him a better deal if he said that defendant shot the gun, Rayford replied, "No. 'Cause we was all in the van together." Rayford never saw any police reports in connection with the shooting and never reviewed his taped statements. In his two previous statements to police, Rayford never stated that defendant shot the gun. He testified at trial that defendant was the shooter, because he "didn't want to go down for nobody what [sic] else they did."

Rayford was subsequently recalled on cross-examination. When Rayford was in jail on April 24, 2005, he called his guardian, named Red. This conversation was taped and played for the jury.

Rayford remembered telling Red that they upgraded the charges against him. He did not remember telling Red that Phillips was "already telling" and that the State was trying to make a deal with Rayford. He did not remember saying that the State wanted him to tell on defendant. He did remember saying that if he and Ingram did not tell, they would get charged with conspiracy. He did not recall saying that "they going to work the deal, I get to go home." During the conversation, Red said, "but [defendant] did it," and Rayford said "Yeah." During cross-examination, Rayford explained that he was testifying that defendant was the shooter, because "they trying to put it off on [Phillips] because he a juvenile and he get lesser time, that ain't right." Defendant wanted Rayford "to come to court and say [defendant] ain't have nothing to do it, and [defendant] was going to go on the stand and say [Phillips] did it. That what [defendant] want me and [Ingram] to come to court and say."

Rayford's statement that defendant wanted Phillips to take the blame for the shooting was consistent with Ingram's testimony, which was that defendant was the driver and Phillips was the shooter. Ingram did not recall telling Mr. Castillo, an investigator who worked for defendant, that he would not testify against or "trick" on defendant. Nevertheless, Ingram admitted that defendant was his cousin and a close friend whom Ingram had known all his life. Also, Ingram admitted that, before he got in the van, he had already heard about the earlier incident involving Phillips. In fact, Ingram testified that he had looked for Phillips earlier that day to see if he was alright. Even though Ingram testified that they were not looking for Kings because they were "just riding and kickin' and drinking and smoking," he also testified that if they had encountered a King that night, Phillips "might try to shoot at 'em."

According to Ingram, defendant was driving and Ingram was in the front passenger seat. Ingram asked Phillips about being shot at, and Phillips told him "parts of it." Phillips did not say much but was very angry. Ingram spotted a car and told defendant to pull over because Ingram thought it was one of the "guys" he associates with; Ingram associates with "a lot of Latinos." Defendant said, "[w]e ain't trying to holler at anybody, we kickin'." Phillips similarly wanted to keep on going. But Ingram wanted to see if it was one of his "guys," so defendant pulled over. Defendant blocked the car in the driveway and asked the occupants if they were Kings. They said no. Phillips, who got between defendant and Ingram, said that they were Kings and reached over defendant and fired a shot. Defendant then made a left turn down another street and pulled over. Ingram did not get a good look at Phillips' gun, because Phillips hid it so fast. Next, they told Phillips to get out of the van. At that time, defendant and Ingram switched seats, because defendant was tired of driving. Ingram was driving when they were pulled over by police.

Ingram's testimony was, for the most part, consistent with his taped statement to police on August 12, 2004. In that statement, Ingram indicated that Phillips said he had a pistol and was looking for Kings. They did not believe Phillips, because they were all drinking "and who was gonna go do something under the influence." Ingram stated that they saw two "guys" pulling into the driveway. Defendant was driving and pulled over and "was like y'all Kings." They kept saying they were not Kings and then Phillips reached over defendant's shoulder and shot one time. They drove off and then Ingram got into the driver's seat. They decided to drop off the pistol somewhere. Then, the police stopped the van. Ingram's statement was inconsistent in that he also stated that the gun found in the van was the gun shot by Phillips; no other gun was involved. At trial, Ingram testified that, when he gave the August 12 statement to police, "a lot of things [he] just gave answers

to because [he] wasn't really thinking about it at the time, [he] was just trying to get up out of there, trying to get up out of the police station."

On cross-examination, Ingram testified that the same charges pending against defendant were pending against him in connection with the shooting. When asked if he drove all night, Ingram replied, "I may have. I was drinking too." However, on redirect examination, Ingram again testified that defendant was driving the van when he got in, when the Hispanics were parked in the driveway, and also when the shot was fired.

In sum, viewed in the light most favorable to the State, the evidence was sufficient to show that defendant was guilty based on accountability. Based on Phillips' testimony alone, the jury could have rationally concluded that defendant was part of a common design to avenge the altercation in which the Kings shot at Phillips, regardless of whether defendant was the driver or the shooter. Also, despite the inconsistencies in Ingram's and Rayford's testimony, the jury could have rationally concluded that defendant was, at the very least, the driver who blocked in the other car and made it possible for the shooter to fire at the victim. The jury accepted the State's version of the events and a rational trier of fact could have found defendant guilty beyond a reasonable doubt under an accountability theory.

As a final matter, the majority's reliance on People v. Newell, 103 Ill. 2d 465 (1984), to conclude that the accomplice testimony in this case failed to establish defendant's guilt beyond a reasonable doubt is misguided. The facts in Newell are very different from the facts in this case because in Newell, the only evidence connecting the defendant with the burglary was the testimony of one accomplice; the other two accomplices denied any involvement by the defendant. Newell, 103 Ill. 2d at 469. Because the only evidence of the defendant's involvement was one accomplice's

testimony, the supreme court correctly held that there was not proof of the defendant's guilt beyond a reasonable doubt. Newell, 103 Ill. 2d at 471. Contrary to Newell, all three accomplices in this case placed defendant and his van at the scene of the crime and identified his role as either the shooter or the driver. Moreover, the supreme court has been careful to limit the interpretation of Newell, describing it as "a very fact-specific case in which the one accomplice who implicated [the] defendant testified under immunity." People v. Rivera, 166 Ill. 2d 279, 289 (1995). For all of these reasons, I would affirm defendant's conviction.