# Illinois Official Reports

## Appellate Court

---

### *People v. Fleming*, 2014 IL App (1st) 113004

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RILEY FLEMING, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3004 |
| Filed | June 25, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court properly granted the State's motion for joinder of the cases against defendant and a codefendant for armed robbery, attempted armed robbery and aggravated discharge of a firearm and the prosecution of his codefendant for attempted first degree murder of a police officer and aggravated discharge of a firearm as he fled from the first offenses, since the charges were related temporally and physically and were part of one comprehensive transaction, especially in view of the location, time, motive, method and common evidence; furthermore, the evidence supported defendant's convictions on an accountability theory and he was required to serve three years of mandatory supervised release based on his status as a Class X offender. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-13561 (02); the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier and Brett C. Zeeb, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Matthew Connors, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Neville and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    This is an apparent case of first impression involving joinder of codefendants and offenses before a single jury. Defendant, Riley Fleming, claims he was denied a fair trial when the same jury decided both the charges against him and the charges brought solely against his codefendant for an arguably subsequent and distinct offense. Fleming also contests the sufficiency of the evidence to convict him of aggravated discharge of a firearm and attempted armed robbery on accountability on the basis that the State failed to offer any evidence supporting its theory other than his mere presence at the scene. Lastly, Fleming contends the trial court should have imposed a two-year term of mandatory supervised release (MSR) because he was found guilty of Class 1 offenses instead of the three-year term which attaches to Class X felonies.

¶ 2    We find the trial court properly exercised its discretion in granting the State's motion for joinder. We further find the evidence was sufficient to support Fleming's convictions and he was properly subjected to a Class X MSR term of three years. We affirm his convictions and sentence.

¶ 3                              BACKGROUND

¶ 4    The State charged Fleming, and codefendant, Brandon Myers, with the armed robbery of Eric Thomas, aggravated discharge of a firearm in the direction of Damarial Pendleton, and the attempted armed robbery of Pendleton. The State theorized that Fleming and Meyers robbed Thomas and attempted to rob Pendleton before fleeing together. The incident occurred on July 1, 2009, around 11:30 p.m. near the 3300 block of Maypole Avenue, Chicago (case 1). The State argued that Fleming robbed Thomas and was accountable for Myers's shooting at and unsuccessful robbery of Pendleton.

¶ 5    In a separate case (case 2), the State charged Myers with two counts of attempted first-degree murder of a police officer and two counts of aggravated discharge of a firearm. These charges stemmed from a shooting involving Myers and two Chicago police officers

about five blocks away from the scene of the robbery and five minutes after Myers and Fleming fled together. Fleming was not charged with the offenses in case 2.

¶ 6    A little over a year after the State brought the charges against Myers in case 2, the State moved to join the two cases, arguing the offenses involved multiple acts that were part of the same comprehensive transaction. In response, Fleming's counsel argued, "[t]hese are totally different crimes. Just prior to the second offense allegedly being committed, as [the State] indicated, my client actually exited himself from the scene. He was not part of it at all." Fleming's counsel also argued that Myers's additional charge, "is a very serious offense and to bring [Fleming] into it is highly prejudicial. Close in time I acknowledge, your Honor. Different police officers involved. Different personnel involved. It would be highly prejudicial." The matter was continued.

¶ 7    On the next court date, Fleming's counsel reiterated the arguments against joinder, specifically highlighting that "when this second incident began to emerge, [Fleming] had actually exited himself from that environment, it is not even suggested that he in any way was a participant." In response to the court's question as to how Fleming would be prejudiced by the joinder, Fleming's counsel cited the serious nature of the attempted murder charge. The trial court granted the State's motion under section 114-7 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-7 (West 2008)), finding the State could have charged Fleming and Myers together for the attempted murder and aggravated discharge of a firearm counts because "the shooting is during the course of the attempted escape from the armed robbery where both men are charged with together. *** It's one comprehensive transaction, an armed robbery, leaving the scene of an armed robbery, the car stops, guys get out, shooting by one person allegedly at the police, shooting back by the police at the one person."

¶ 8                                    Single Jury Trial

¶ 9    The trial court introduced Fleming and Myers to the jury and instructed the jury regarding the charges. The court informed the jury that "both men are charged with the offenses" and then listed the offenses in both case 1 and case 2 without differentiating between the codefendants.

¶ 10    Both victims testified. Pendleton testified he was outside around 11:30 p.m. on July 1, 2009, with Thomas and another person when a gray Ford stopped suddenly in front of them. Two men exited. The front passenger wore a mask, blocking the lower part of his face, and a white shirt. The rear passenger wore a red shirt.

¶ 11    Pendleton took off running and the masked man chased him. Pendleton tripped and fell. The masked man pointed a gun down at him from 15 feet away and said "break yourself" twice, which Pendleton understood to mean "it was a robbery." Pendleton started running again toward the street. The masked man fired, pursued Pendleton across the street, and then fired a second shot. When he looked back after a few feet, Pendleton was no longer being chased and the gray Ford was driving away.

¶ 12    Pendleton then saw his friend Antonio's van coming down the block. He got in and told Antonio what happened. Antonio pursued the Ford. At Washington Street, the Ford ran a red light, and then a police car made a U-turn to pursue it. Pendleton saw the police curb the Ford a few blocks away. When Pendleton and Antonio got out of the van, the officers directed them to the ground.

- 3 -

¶ 13    Thomas testified that on the night of the incident, he was with Pendleton across the street from an apartment building on Maypole waiting for a friend to come down and drive them home. When the gray car pulled up, Thomas saw a masked person in the passenger seat. Before anyone got out of the car, Thomas ran and did not look behind him. He heard a gunshot, followed by two more. After running about 20 feet, Thomas realized no one was following him.

¶ 14    Thomas crossed the street to the apartment building. At the door, someone came up behind him and told him it was a robbery. The person took his wallet, which contained a few hundred dollars, his keys, and his cellular telephone. Thomas acknowledged he never looked back at the person or saw a gun, but believed the individual had a gun because he felt a "kind of hard" object at his back. When Thomas eventually looked behind, he saw a person with a red shirt get into the backseat of the gray car.

¶ 15    While Thomas tried to enter the apartment building, a friend, Johnny Dye, came down looking for Pendleton. Thomas and Dye drove around the block a few times but did not find Pendleton. When they arrived in the area of Madison and Whipple, they saw the police with Pendleton. Thomas thought Pendleton had been shot, so he went over to him. The police drew their weapons and asked Thomas what he was doing. Thomas told the police he was checking on his friend because they had just been robbed. Thomas informed the police the man who robbed them was wearing a red shirt. The police brought over Fleming, who was wearing a red shirt, for Thomas to identify. Thomas indicated he could identify the red shirt but did not get a good look at the individual who robbed him.

¶ 16    Later that morning, Thomas viewed a physical lineup at the police station but was unable to identify the offender. Pendleton also viewed a lineup and identified Myers as the person who shot him. In court, Pendleton identified Myers as the person wearing the mask who shot at him and Fleming as the person wearing the red shirt.

¶ 17    During cross-examination, Pendleton testified for the first time that the person in the red shirt ran after Thomas.

¶ 18    Chicago police officers Jason Bala, Francisco Iza and Marc Debose, patrolling in an unmarked squad car on July 1, 2009, saw a gray Ford run a red light at Washington and Kedzie around 11:30 p.m. The officers followed the car because of the traffic infraction; they did not know about the robbery. The Ford stopped at 3018 West Madison and, according to Bala's testimony, two African American males exited. The male in the front passenger seat wore a black shirt; the male in the rear passenger seat wore a red shirt. Officer Bala saw the man in the black shirt put a gun in his waistband, so he yelled to Iza and Debose to warn them. Bala identified Myers in court as the person in the black shirt with the gun and Fleming as the individual in the red shirt. Bala testified that Fleming and Myers ran southbound through a vacant lot after getting out of the car.

¶ 19    Officer Iza testified that he heard Bala yell that the man in the black shirt was armed. Iza took out his gun and chased Myers, while Officer Debose pursued Fleming, who was running just west of Myers. Iza saw Myers holding his side. Iza yelled, "stop, Chicago police" three times, but Myers kept running. On the corner of Madison and Whipple, Myers fell. When he got up, he ran southbound across Madison to an empty, grassy lot. About halfway through the lot, Myers turned toward Officers Iza and Debose, looked in their direction, and "with his left hand he took one shot towards us." Iza testified he feared for his and Debose's safety, so he fired three to four shots at Myers. One of the shots hit Myers in the leg; he fell to the ground.

¶ 20    Officer Bala testified he heard four gunshots while he was following the Ford, so he turned westbound on Madison, where he saw Officer Iza standing over Myers. The Ford got away and the driver was never identified.

¶ 21    Officer Debose testified that when Myers fired, he held the gun in his left hand about waist high with his right hand near his left wrist and he was standing about three to four feet west of Officer Iza. Debose stopped chasing Fleming and went over to Officer Iza and Myers. Debose saw a gun on the ground a few feet away from Myers. After the shots were fired, Debose saw Fleming run south and then west through a gangway. Debose used the police radio to inform other officers in the area what was happening.

¶ 22    Officer Rojas testified he was on patrol in the area when he heard messages over the radio that (1) gang enforcement officers were nearby chasing a vehicle; (2) the individuals had left the car, shot at the police, and were on foot; and (3) an individual wearing a red shirt was running southbound from the area. Officer Rojas observed a white sport utility vehicle (SUV) parked near 15 South Albany and saw an individual in a red shirt, later identified as Fleming, hiding underneath it. Rojas detained Fleming, who did not have a gun, cash, keys, or a cellular telephone on him. None of those items were found near the SUV. Thomas arrived and identified Fleming as the man who robbed him. Fleming was transported to the scene of the shooting, where Pendleton identified him as a person involved in the robbery on Maypole. Officer Iza identified Fleming as the individual who fled the gray Ford and ran from him.

¶ 23    Officer Iza testified that a liquor store video camera operating in the area showed Myers and Fleming running southbound through the lot and onto Madison. It did not capture Myers shooting at the officers. The video was introduced. Iza also identified the weapon Myers dropped.

¶ 24    Detective Greg Swiderek testified he conducted two physical lineups on the day of the shooting, and both Thomas and Pendleton identified Myers as the shooter. On cross-examination by Myers's counsel, Swiderek testified that at the scene, Thomas did not say that Myers robbed him.

¶ 25    The physical evidence showed no latent fingerprint impressions suitable for comparison on the gun recovered near Myers. The gunshot residue test on Myers was positive for his right hand and negative for his left; no gunshot residue was found on Fleming about an hour after his arrest. Two fired casings found near 3300 West Maypole matched the gun recovered near Myers. Four discharged casings from the vacant lot near 2 South Whipple matched Officer Iza's gun. A bullet hole in the siding of a garage in the alley of 3027 Madison was "free of dust and debris," but no bullet was found.

¶ 26    The trial court denied Fleming's motion for a directed verdict. Neither Fleming nor Myers offered evidence on his own behalf.

¶ 27    During closing arguments, the prosecutor argued, among other things, "Those two men, ladies and gentlemen, sit down before you ready to be judged, to be held responsible for their crime spree on July 1, 2009." The jury was instructed that Fleming was charged with armed battery of Thomas and the attempted armed robbery of and aggravated discharge of a firearm at Pendleton. The jury also received instructions on accountability.

¶ 28    The jury convicted Fleming of aggravated discharge of a firearm and the attempted armed robbery of Pendleton, but found him not guilty of armed robbery of Thomas.

¶ 29    Myers was found guilty of aggravated discharge of a firearm at Officers Iza and Debose, but not guilty of attempted first-degree murder of the officers. Myers also was found guilty of aggravated discharge of a firearm at Pendleton and attempted armed robbery of Pendleton, but he was acquitted on the armed robbery charge.

¶ 30    Because of his criminal background, Fleming was Class X mandatory. The trial court sentenced him to 15 years in prison on the aggravated discharge of a firearm count and a concurrent 22-year prison term for the attempted armed robbery. The trial court denied Fleming's motion to reconsider the sentence.

¶ 31                                                        ANALYSIS

¶ 32                                          Joinder Before a Single Jury

¶ 33    Fleming contends joining case 1 with case 2 involving only codefendant Myers's attempted first-degree murder case of the police officers denied Fleming a fair trial. Fleming contends the error was not harmless. He asks that we reverse his convictions and remand for a new, separate trial. We disagree.

¶ 34    Fleming failed to raise the issue in a posttrial motion, forfeiting review of his claim. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Recognizing this, Fleming urges us to review the issue under the plain-error doctrine. Under that doctrine, we may review a forfeited error when either (1) "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence" or (2) "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). The defendant bears the burden of persuasion under both prongs. *Id.* at 187. Before we consider whether Fleming satisfied either prong of the plain-error doctrine, we first determine whether an error exists. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008). If there is no error, there can be no plain error. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009).

¶ 35    Fleming maintains the trial court improperly joined the two cases because the offenses involved could not have been joined in a single charge against Fleming where he was not charged with the offenses in case 2. By joining the two cases, according to Fleming, the court allowed the State to introduce evidence that prejudiced him because the State alleged he was accountable for Myers's actions in case 1 and, therefore, the jury could not reasonably be expected to disregard the serious evidence in case 2–the shooting at two police officers–in the context of the State's accountability theory in case 1.

¶ 36    Section 111-4(a) of the Code addresses when it is proper to join charges and defendants for trial. Under section 111-4(a), two or more offenses may be charged in the same indictment if the charged offenses "are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2008). Two or more defendants may be charged together if they are alleged to have participated in the same comprehensive transaction. 725 ILCS 5/111-4(b) (West 2008). In determining whether a defendant's acts were part of the same comprehensive transaction, the most crucial factors to consider include: "the proximity of time and location of the various charges; the identity of evidence which would be presented to prove each charge; whether the offenses shared a common method; and whether the same or similar evidence would establish the elements of the offenses." *People v. Jackson*, 233 Ill. App. 3d 1089, 1098 (1992) (citing *People v. Coulter*, 230 Ill. App. 3d 209, 216-17 (1992)).

¶ 37    Conversely, section 114-8 discusses when charges may be severed. "If it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require." 725 ILCS 5/114-8 (West 2008).

¶ 38    Thus, charges against a defendant may be joined if the offenses are based on two or more acts which are part of the same comprehensive transaction unless the defendant will be prejudiced by the joinder of separate charges. *People v. Patterson*, 245 Ill. App. 3d 586, 587 (1993). The trial court has broad discretion to sever, and, as a reviewing court, we affirm unless that decision constitutes an abuse of discretion. *Id.* at 588. A trial court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the trial court's view. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 39    We disagree with Fleming's contention that the trial court misinterpreted the statutory language of section 114-4. He argues that while he could have been charged with the offenses in case 2, this does not change the fact that he was not so charged. But, as the State maintains, joinder was proper because the acts alleged against Myers in case 2 are part of one comprehensive transaction involving case 1. The charges in case 2 were related both temporally and physically to the charges in case 1.

¶ 40    Applying the factors discussed in *Jackson*, the trial court did not act unreasonably in finding the offenses in case 1 and case 2 were part of the same comprehensive transaction. The charges here are sufficiently related in location, time, motive, method and common evidence to support the trial court's ruling in favor of joinder.

¶ 41    The "most important factors" in determining whether offenses are part of a comprehensive transaction are their proximity in time and location and whether there is common evidence with respect to the offenses. *People v. Harmon*, 194 Ill. App. 3d 135, 139-40 (1990). The proximity of time and location support joinder. The offenses took place five blocks from each other and about five minutes apart.

¶ 42    The second factor, common evidence, "asks not whether evidence of the two crimes is similar or *identical* but rather whether the court can *identify* evidence linking the crimes." (Emphases in original.) *People v. Walston*, 386 Ill. App. 3d 598, 605 (2008). We find the application of this second factor in *People v. Quiroz*, 257 Ill. App. 3d 576 (1993), useful in guiding us here. In *Quiroz*, evidence was offered linking two shootings to the defendant's alleged armed robbery during his escape–the defendant attempted to enter the home of a fellow gang member as he fled the scene of the shootings. *Quiroz*, 257 Ill. App. 3d at 586. This evidence helped to show that all three crimes were part of a common criminal scheme by framing the defendant's theft of the car as a continuation of his attempts to flee the scene of the two shootings. *Quiroz*, 257 Ill. App. 3d at 586. Accordingly, the *Quiroz* court considered the defendant's intervening attempt to hide in the house as linking his crimes of shooting two people and stealing a car to escape. See *Quiroz*, 257 Ill. App. 3d at 586.

¶ 43    Myers's shooting at the police officers was a criminal effort to avoid apprehension for the attempted armed robbery. The evidence of both Myers's and Fleming's actions in running from the police stemmed from the same common motive–to avoid criminal responsibility for the attempted robbery. That Myers next shot at the police and Fleming hid under a vehicle is insignificant; both were a continuation of their attempts to flee the scene of the armed robbery. The trial court did not abuse its discretion in finding this factor favored joinder.

¶ 44    The third factor, "common method," asks "whether the offenses were part of a 'common scheme,' so that each of the offenses supplies a piece of a larger criminal endeavor." *Walston*, 386 Ill. App. 3d at 606-07. Fleming and Myers left the scene of the armed robbery together in the same car. When they were pursued by the police, they both fled the car to evade apprehension for the armed robbery. Myers shot at the police while Fleming ran and hid. The two crimes were part of a common scheme. Each of the offenses–the robbery and the shooting at the police–were part of the larger criminal endeavor–to evade criminal responsibility for the first crime.

¶ 45    The fourth factor, whether similar evidence would establish the elements of the offenses, does not support joinder, but in light of the record, we decline to find the trial court abused its discretion in joining the two cases.

¶ 46    Regarding Fleming's contention that he was prejudiced by the joinder, we disagree. As the State points out, the trial court admonished the jury that it "should give separate consideration to each defendant," and the court went on to explain, "[e]ach is entitled to have his case decided on the evidence and the law which applies to him." The court further cautioned that "[a]ny evidence which was limited to one defendant should not be considered by you as to the other defendant." Because a jury is presumed to follow the court's instructions (*People v. Taylor*, 166 Ill. 2d 414, 438 (1995)), Fleming is unable to show how the joinder prejudiced him.

¶ 47    Finding no abuse of discretion in joining the cases, there can be no plain error.

¶ 48                                    Sufficiency of the Evidence

¶ 49    Next, Fleming contends the State failed to prove beyond a reasonable doubt that he shared Myers's criminal intent or that there was a common criminal design and, therefore, he could not properly be held accountable for Myers's actions. Fleming asks that his convictions be reversed.

¶ 50    The jury convicted Fleming of aggravated discharge of a firearm and attempted armed robbery, finding him accountable for Myers's actions. Fleming contends the evidence, at best, shows that he was present when Myers shot at and tried to rob Pendleton and that he drove away from the scene with Myers after the incident. Fleming argues his presence at the scene and subsequent flight are insufficient, even when considered in the light most favorable to the State, to prove he intended to aid Myers in the commission of the crimes.

¶ 51    In reviewing the sufficiency of the evidence to sustain a conviction, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Thomas*, 178 Ill. 2d 215, 231-32 (1997). We will not substitute our judgment for that of the trier of fact on the weight to be given the evidence or the credibility of the witnesses. *Thomas*, 178 Ill. 2d at 232. The trier of fact must "resolve conflicts in the testimony, *** weigh the evidence, and *** draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The standard in *Jackson* applies when reviewing a finding that a defendant was guilty through an accountability theory. *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

¶ 52    Under section 5-2(c) of the Criminal Code of 1961, Illinois's accountability statute (720 ILCS 5/5-2(c) (West 2008)), a person is legally accountable for the conduct of another when,

"either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense."

To prove the defendant had the intent to promote or facilitate the crime, the State must present evidence that establishes, beyond a reasonable doubt, that (i) the defendant shared the criminal intent of the principal or (ii) there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). The common design rule holds that where "two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *In re W.C.*, 167 Ill. 2d at 337. Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996).

¶ 53    In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338. "Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute circumstantial evidence which may tend to prove and establish a defendant's guilt." *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990). As a reviewing court, we will not set aside a trier of fact's finding that a defendant is legally accountable for the criminal act of another, unless the evidence, when viewed in the light most favorable to the prosecution, is "so improbable or unsatisfactory" that a reasonable doubt of the defendant's guilt exists. *People v. Cooks*, 253 Ill. App. 3d 184, 189 (1993).

¶ 54    Fleming relies on *People v. Washington*, 375 Ill. App. 3d 1012, 1032 (2007), a case from the Second District, to argue that a defendant's presence at the scene and subsequent flight with the principal after the crime are not sufficient to sustain a conviction based on an accountability theory. In *Washington*, the appellate court reversed the defendant's convictions finding the evidence failed to prove beyond a reasonable doubt that the defendant shared a common purpose to shoot someone. At trial, the evidence showed the defendant and two other men picked up a fourth person, Jonathan Phillips, and drove around in a van listening to music, smoking marijuana and drinking alcohol. *Washington*, 375 Ill. App. 3d at 1021. At some point, the van stopped and someone fired shots at the victim's car, hitting him in the arm. *Washington*, 375 Ill. App. 3d at 1013-14. At trial, the evidence was conflicting concerning whether the defendant was the driver or a passenger in the van, whether Phillips or the defendant was the person who shot the victim, and whether the defendant knew of a plan to shoot at rival gang members after Phillips got into the van. *Washington*, 375 Ill. App. 3d at 1025-32.

¶ 55    The appellate court, relying on the accountability analysis in *People v. Perez*, 189 Ill. 2d 254 (2000), held the State failed to prove beyond a reasonable doubt that the defendant participated in a common criminal design because the State failed to offer any evidence that

defendant intentionally aided in or encouraged the plan to drive around looking for someone to shoot. *Washington*, 375 Ill. App. 3d at 1031. The court found it significant that the accomplices all differed on the critical issue of the defendant's involvement. *Washington*, 375 Ill. App. 3d at 1028-29. "There was no objective corroboration, no credible testimonial corroboration, and no absolute conviction of truth in the testimony so as to support defendant's guilt. [Citation.] Even if two of the alleged accomplices corroborated one another on one pertinent issue, they subsequently contradicted one another on others." *Washington*, 375 Ill. App. 3d at 1028-29. The court found that if the inconsistent, incredible testimony regarding the defendant as the driver or the shooter was set aside, there was no evidence left to support a conclusion that the defendant intentionally aided and abetted in the crime. *Washington*, 375 Ill. App. 3d at 1031. The court reversed because there was no consistent account of the events or the defendant's role in them and, therefore, there was reasonable doubt as to the defendant's guilt. *Washington*, 375 Ill. App. 3d at 1028.

¶ 56 Fleming argues that similar to *Washington*, the State failed to present any evidence that he knew that Myers intended to rob or shoot at Pendleton. For Fleming, it is significant that the State failed to present evidence that he knew Myers was armed with a gun before they got out of the Ford together or that Myers said anything to Fleming about his intent to shoot or rob Pendleton. According to Fleming, absent some evidence of a common plan, accountability could not attach to Fleming.

¶ 57 Fleming also relies on *People v. Evans*, 87 Ill. 2d 77 (1981), *People v. Estrada*, 243 Ill. App. 3d 177 (1993), and *People v. Taylor*, 164 Ill. 2d 131 (1995), to argue his presence at the scene was insufficient to prove accountability based on common design. Fleming contends the argument against accountability is even stronger here than in those cases because the evidence does not indicate that Fleming knew Myers was armed before the incident.

¶ 58 In *Evans*, the evidence was insufficient to prove accountability based on common design because there was "no direct evidence." The evidence showed the defendant had a dispute with the victim earlier that day; the defendant provided the shooter with bullets for his gun; and, then, later drove the shooter to the location where the victim was shot. *Evans*, 87 Ill. 2d at 85.

¶ 59 In *Estrada*, this court found the evidence insufficient to show a common design or plan to shoot the victim where the defendant's acts showed he intended to intimidate the victim with a tire iron and there was no evidence that he was aware that the shooter intended to shoot the victim even though defendant knew he was armed. *Estrada*, 243 Ill. App. 3d at 185.

¶ 60 In *Taylor*, the court found the evidence insufficient to prove the defendant aided the shooter or had knowledge that he intended to shoot at the victim when the shooter exited the defendant's car, even though the defendant knew the shooter had a gun in the car. *Taylor*, 164 Ill. 2d at 139.

¶ 61 Thomas testified he saw a man wearing a red shirt–Fleming–get in the backseat of the gray car. Thomas did not see Fleming get out of the car because he ran away before anyone got out of the car. Pendleton testified on direct that he saw Fleming exit the car, but that Myers was the one who chased him and shot at him. During cross-examination, Pendleton testified that Myers ran after him and Fleming ran after Thomas. Fleming argues that had there been a separate, but simultaneous jury trial, Fleming's jury would not have heard the testimony that Fleming ran after Thomas. Alternately, Fleming argues that even if Pendleton's testimony was properly before the jury, by acquitting Fleming of the armed robbery charge, "the jury apparently was not convinced that Fleming ran after Thomas." Fleming argues this court should reach the

same conclusion based on the evidence–that Fleming did not run after Thomas. Without that piece of evidence, Fleming argues, the remaining evidence–that he got out of the same gray car as Myers and then, at some point, got back in, drove away, and was caught by the police–is insufficient to sustain his conviction.

¶ 62 Fleming argues the State's evidence only proves beyond a reasonable doubt that he was in the same car as Myers and that he fled after the police pulled the car over for running a red light. Fleming points to the lack of evidence that he knew Myers was armed or knew that Myers intended to shoot and rob Pendleton. In addition, he was not the driver of the car and no gun or items from the robbery were found on him. Fleming contends the evidence failed to prove he intentionally acted as Myers's accomplice and, therefore, his convictions for attempted armed robbery and aggravated discharge of a firearm must be reversed.

¶ 63 The State distinguishes *Evans*, *Estrada* and *Taylor*, noting that Pendleton identified both Myers and Fleming as exiting the gray Ford and each trying to rob a separate individual before returning to the same car and fleeing the area together. Thomas corroborated this account by testifying that he heard two gunshots as he fled from the scene and then saw Fleming, wearing a red shirt, get back into the same gray Ford he had previously exited. Together, Fleming and Myers drove away from the scene and, then, when pursued by the police, fled from their car. Fleming was eventually detained after he was found hiding under a car.

¶ 64 We agree with the State that because of Fleming's actions, unlike the defendants in *Evans*, *Estrada*, and *Taylor*, he was not convicted based on his "mere presence" at the scene but, rather, based on eyewitness testimony that he and Myers acted together during the robbery.

¶ 65 The State contends that when the evidence is viewed in the light most favorable to the prosecution, the evidence establishes not only that Fleming shared the criminal intent of Myers, but also that there was a common criminal design. Active participation is not required to support a guilty verdict under an accountability theory. *Taylor*, 164 Ill. 2d at 140. A jury may find a defendant accountable for another's acts if the defendant shared a common criminal design with the principal and that design can be inferred from the circumstances. *Taylor*, 164 Ill. 2d at 141.

¶ 66 The evidence showed Myers and Fleming arrived in the same car to the scene of the robbery, they exited the car together and attempted to engage in multiple armed robberies at the same time before returning to the same car and fleeing the scene together. Fleming and Myers maintained a close affiliation during the attempted robbery, and when they were pursued by the police, both men jumped out of the car and fled in opposite directions. Furthermore, Fleming's decision to flee the scene and hide under a car to evade the police is relevant evidence where his "involvement can be inferred from inconsistent statements and after-the-fact behavior that amount to an attempt to conceal the truth." *People v. Reeves*, 385 Ill. App. 3d 716, 727 (2008).

¶ 67 Although Fleming's mere presence at the scene of the crime, coupled with his flight, was insufficient to support his conviction (*People v. Reid*, 136 Ill. 2d 27, 61 (1990)), the jury properly considered his presence during the commission of the crime, his continued close association with Myers after the crime, and his flight from the scene (*People v. Johnston*, 267 Ill. App. 3d 526, 534 (1994)), in holding Fleming accountable.

¶ 68 We agree with the State that the trial evidence supports the jury's finding that a common criminal purpose existed between Fleming and Myers during the commission of the offenses

such that Fleming could be found accountable for Myers's actions. Therefore, we reject Fleming's challenge to the sufficiency of the evidence.

¶ 69                         Mandatory Supervised Release (MSR) Term

¶ 70        Lastly, Fleming contends his three-year MSR term is void and must be reduced to a two-year term because he was convicted of Class 1 offenses, not a Class X offense. We disagree. Our review is *de novo* because this involves a question of statutory interpretation. *People v. Robinson*, 172 Ill. 2d 452, 457 (1996). Despite Fleming's failure to raise this issue before the trial court, the issue has not been forfeited because a void sentence may be challenged at any time. *People v. Arna*, 168 Ill. 2d 107, 113 (1995).

¶ 71        Fleming was sentenced as a Class X offender under section 5-4.5-95(b) of the Unified Code of Corrections (Unified Code) (formerly section 5-5-3(c)(8)), which imposes mandatory Class X status to defendants who have at least two prior convictions that were classified as Class 1 or Class 2 felonies. 730 ILCS 5/5-4.5-95(b) (West 2008). Fleming does not dispute that he was subject to Class X sentencing based on his criminal record.

¶ 72        Fleming's contention that a defendant sentenced under section 5-4.5-95(b) of the Unified Code as a Class X offender must be subjected to the MSR term attached to the underlying offense and not the Class X enhancement has been addressed by our courts multiple times. The law is clear that when a defendant qualifies for a Class X sentencing enhancement, a three-year period of MSR must be imposed. See, *e.g.*, *People v. Watkins*, 387 Ill. App. 3d 764, 766-67 (2009); *People v. Smart*, 311 Ill. App. 3d 415, 417-18 (2000); *People v. Anderson*, 272 Ill. App. 3d 537, 541 (1995).

¶ 73        Fleming recognizes the precedent establishing that a defendant sentenced to an enhanced Class X sentence is subject to the three-year MSR term, not the MSR term attached to the underlying offense. But, he argues those cases did not have the benefit of the analysis in *People v. Pullen*, 192 Ill. 2d 36 (2000), and, thus, should not be relied on.

¶ 74        In *Pullen*, our supreme court considered the consecutive sentencing provision and its application to section 5-5-3(c)(8) of the Unified Code. *Pullen*, 192 Ill. 2d at 38; 730 ILCS 5/5-5-3(c)(8) (West 1994). The supreme court explained that section 5-5-3(c)(8) of the Unified Code requires that those individuals subject to its provisions be sentenced as Class X offenders, not that their offenses be treated as Class X felonies for sentencing purposes. *Pullen*, 192 Ill. 2d at 43. Accordingly, the supreme court held that where the defendant was convicted of two Class 2 felonies, but was sentenced as a Class X offender, the maximum sentence he could receive should have been based on the maximum sentence allowed for two Class 2 felonies, not two Class X felonies. *Pullen*, 192 Ill. 2d at 43-44.

¶ 75        Fleming's contention, however, fails to recognize that there have been multiple cases since *Pullen* which have rejected the *Pullen* MSR analysis and affirmed that an enhanced Class X offender is subject to the three-year MSR term as held in *Anderson*, *Smart*, and *Watkins*. See, *e.g.*, *People v. Brisco*, 2012 IL App (1st) 101612; *People v. Rutledge*, 409 Ill. App. 3d 22 (2011); *People v. McKinney*, 399 Ill. App. 3d 77 (2010); *People v. Lee*, 397 Ill. App. 3d 1067 (2010).

¶ 76        We find no reason to depart from these decisions. Because the law is clear that a defendant sentenced to an enhanced Class X sentence is subject to the three-year MSR term, Fleming's sentence is affirmed.

## CONCLUSION

The trial court did not abuse its discretion in holding that the charges in both cases were related temporally and physically and, thus, combined to form one comprehensive transaction. Joinder was therefore proper. Viewing the evidence in the light most favorable to the prosecution, we find the State presented sufficient evidence to sustain Fleming's convictions based on a theory of accountability. Lastly, we hold that Fleming, as a Class X offender because of his prior convictions, is required to serve the Class X MSR term of three years.

Affirmed.