# Illinois Official Reports

## Appellate Court

---

### *People v. Spencer*, 2016 IL App (1st) 151254

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH SPENCER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-1254 |
| Filed | September 13, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-9685; the Hon. Colleen Ann Hyland, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Jodi L. Garvey and Patrick W. Blegen, both of Blegen & Garvey, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1 In April 2012, Kenneth Spencer and his codefendant, Jorge Morales, traveled to Arizona with another man, Jacob Force, to purchase cocaine and bring it back to Illinois. On the return trip, Force, who was carrying the cocaine, was driving in a separate car from Spencer and Morales when both cars were stopped by police and searched. Spencer was convicted of possession of a controlled substance with intent to deliver and sentenced to 25 years of imprisonment.

¶ 2 We find that there was sufficient evidence to support Spencer's conviction because Spencer and Morales constructively possessed the drugs, though the drugs were in a different car, and Spencer was accountable for Morales's and Force's actions. The trial court did not err in admitting coconspirator statements through Force's testimony, and any error in admitting a piece of metal seized from one of the cars was harmless. Spencer's sentence was not excessive in light of his extensive criminal history, particularly compared to his codefendants. Finally, we decline to rule on Spencer's ineffective assistance of counsel claim, as that claim would be better raised in a postconviction petition.

¶ 3 BACKGROUND

¶ 4 Spencer was charged with possession of a controlled substance (900 grams or more of cocaine) with the intent to deliver. His two codefendants, Jacob Force and Jorge Morales, were also charged. Under a plea deal with the State, Force testified against Spencer and Morales at their joint trial.

¶ 5 Force testified that in March 2012, he met Morales in Chicago through Force's associate, Jose Retteguin, for whom Force had dealt drugs. During that conversation, Retteguin asked if Force would travel to California to pick up some cocaine and bring it to Chicago. Force agreed; the destination was later changed to Arizona. On April 16, 2012, Retteguin brought Force to Chicago from Peoria, and they met with Morales and another man nicknamed "Lilo." Lilo gave Force a cell phone and told him to program it with the number of Lilo, Retteguin, and Morales but not to use the phone to speak to anyone else. Lilo gave Force money to rent a room for the night.

¶ 6 The next day Morales took Force to meet Spencer. Morales told Force that Spencer would be traveling with them, and they would be using Spencer's car, an Audi A4. Morales said that Force would drive the Audi. Morales and Force then went to Midway airport, where Morales rented from Hertz a maroon Mazda for the trip.

¶ 7 On April 18, Force and Morales again met with Spencer. Spencer gave Force the Audi to drive. The Audi had an aftermarket hidden compartment (referred to as a "trap") behind the driver's seat. They met Lilo at a parking lot; Spencer had money for the drugs but could not fit the money into the trap. Spencer, Force, and Morales went to a restaurant while Lilo repackaged the money so it would fit in the trap.

¶ 8 After the money was placed in the trap, Spencer, Force, and Morales left for Tucson. Force drove Spencer's Audi, while Spencer and Morales drove in the Mazda behind him. When they reached New Mexico, Force felt tired because he had been driving for over 24 hours; he called Morales on the cell phone he had been given, and the three men stopped at a hotel. Morales gave Force cash for the hotel, but the hotel required a credit card, so Spencer

used his credit card to pay for hotel rooms. At trial, Force identified a surveillance video from the hotel, showing himself, Morales, and Spencer in the lobby.

¶ 9     The next morning, the three continued on their way. Generally, the cars traveled close together and would only be out of each other's sight briefly. They arrived in Tucson in the late afternoon of April 20 and rented a hotel room.

¶ 10    On the morning of April 21, Morales took the keys to the Audi and returned to the hotel room with a duffle bag containing the drug money. The money was vacuum sealed, and Morales and Spencer unpackaged it and counted it, asking Force to count $5000 in one package. Spencer spoke about the amount of money and the price of the cocaine they intended to purchase. The three men drove to a condo in Tucson; Force stayed in the car. They then drove to Walmart, where Spencer and Morales purchased duct tape, grease, dog repellent, and plastic wrap (though Force testified he was unsure about the plastic wrap).

¶ 11    The next day, April 22, the three men drove in the Audi to McDonald's, met another man, and then followed him to another house in Tucson. They pulled the Audi into the garage and went into the house, which did not contain much furniture. Other men in the house brought out five kilograms of cocaine. Morales and Force began packaging the cocaine; Spencer opened one package, and Force assumed Spencer was testing the cocaine. All three men packaged the cocaine by putting it in duct tape, then a layer of plastic wrap, then grease, then more plastic wrap, vacuum-sealing it, and another layer of duct tape. Morales told Force that the grease was to create a scent so that police dogs would not be able to smell the drugs. Packaging the cocaine took about an hour, then Spencer took the drugs to the Audi and tried to stow them in the trap. The fifth kilogram would not fit, so Morales and Spencer cut it in half and repackaged it. Morales, Spencer, and Force returned to their hotel to get the Mazda. They then left Tucson.

¶ 12    Again, Force drove the Audi while Morales and Spencer were in the Mazda. The plan was to drive straight back to Chicago, but somewhere in New Mexico, Force again called Morales and told him he was getting sleepy, so the two cars stopped at a rest area for a few hours. They drove all day April 23, and approached Chicago in the early morning of April 24. They passed through Dwight, Illinois, between 4:30 and 5:00 in the morning. Morales then called Force and told him to pull over so that Morales and Spencer could switch driving.

¶ 13    While driving on Interstate 294 near Chicago, Force saw a number of police cars. He called Morales to ask what was going on, and Morales, speaking quickly, said that he did not know and to step on it. A few minutes later, around 6:20 a.m., the police stopped Force. The Mazda kept driving.

¶ 14    Police asked Force for his license and registration and then inquired as why he was driving someone else's car. Spencer had earlier instructed Force to say that he was test-driving the car, so Force told police as much and gave them Spencer's name, which was on the car's insurance. Police asked to search the car, and Force consented because he didn't want to act guilty and didn't think they would find the drugs. Force was arrested.

¶ 15    After his arrest, Force spoke to law enforcement several times and made written statements but did not tell the whole story of the drug deal because he did not think he would benefit from revealing the information. Finally, in November 2013, Force told law enforcement and prosecutors the whole truth so that he could get a plea agreement. In exchange for his testimony, the State agreed to lessen the charge against Force, subjecting

him to a sentencing range of 6 to 30 years, served at 50%, instead of a range of 15 to 60 years, served at 75%.

¶ 16    As it turned out, law enforcement officers had been on the lookout for the Mazda and the Audi and first spotted them in Dwight, about 80 miles from Chicago. At that point, police began following the cars for about an hour until the cars were stopped. Officers testified that the two cars, while separated by other vehicles, moved in tandem; when one moved to the left lane, the other would do the same thing.

¶ 17    When Force was pulled over, he told police that he had arranged to buy the Audi from Spencer. After he consented to the search, police brought a drug-sniffing dog to the car. The dog "alerted" at the driver's door and then jumped into the car through the open window, went to the rear seat, and started biting at the seam of the seat. The "trap" containing the cocaine was found at that spot. Just after Force was pulled over, other police pulled over the Mazda and arrested Spencer and Morales.

¶ 18    During an inventory search of the Audi, police found packages of cocaine in the trap, as well as a receipt from a New Mexico hotel. Police also seized two cell phones from Force. In searching the Mazda, police found a receipt from the same New Mexico hotel, for April 19, 2012, with Spencer's name. The Mazda also contained a receipt from Hertz at Midway airport, showing that Morales had rented the Mazda from April 17 to April 24, 2012. There was a receipt from a Walgreens drug store in Tucson, Arizona, dated April 21, 2012. Finally, police found a piece of silver metal in the Mazda. At trial, DEA agent Garrett Malloy testified that the metal "appears to be similar size" or "kind of the same dimensions" as the opening of the trap in the Audi. (The metal piece was admitted as evidence, over objection.)

¶ 19    The jury convicted both Spencer and Morales. At sentencing, the State argued that Spencer was a recidivist. He had several prior convictions for drug sales and a probation sentence that was terminated unsatisfactorily. And Spencer had been arrested for another crime while on bond for this one. Spencer's attorney argued that Spencer had never committed any violent crimes and was devoted to his family.

¶ 20    The trial court noted that it had considered all of the evidence, including letters from Spencer's friends and family members. The court stated that Spencer had an "extensive" criminal background and had already spent 21 years of his life in prison for other crimes. He had not been rehabilitated by these sentences and had not complied with the bond conditions for this case. The trial court sentenced Spencer to 25 years of imprisonment, to be served at 75%. Spencer moved to reconsider the sentence, arguing that there was a sentencing disparity between Spencer and Morales (who received 16 years). The trial court rejected this argument because Morales did not have any criminal history before this case.

¶ 21                                   ANALYSIS

¶ 22                            Sufficiency of Evidence

¶ 23    Spencer argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt because it failed to prove that he actually or constructively possessed the drugs within Illinois. The relevant inquiry, when faced with a challenge to the sufficiency of the evidence, involves, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). As a

reviewing court, we will not substitute our judgment for that of the trier of fact on questions concerning the weight of the evidence or the credibility of the witnesses. *Id.* at 375. We will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id.*

¶ 24 The elements of unlawful possession of a controlled substance with intent to deliver are (1) Spencer had knowledge of the presence of the controlled substance, (2) the drugs were in his immediate possession or control, and (3) he intended to sell them. 720 ILCS 570/401 (West 2006); *People v. Sherrod*, 394 Ill. App. 3d 863, 865 (2009). Spencer seems to be challenging the second element.

¶ 25 Possession can be either actual or constructive. A person actually possesses an item if he or she has "present personal dominion" over the item; in contrast, a person constructively possesses it if he or she has "the intent and capability to maintain control and dominion" over the item without actual possession. (Internal quotation marks omitted.) *People v. Pittman*, 2014 IL App (1st) 123499, ¶ 36. A person may have constructive possession of contraband even if that possession is joint or others have access to the area where the contraband was recovered. *Id.* ¶ 43; see also *People v. Givens*, 237 Ill. 2d 311, 335 (2010) ("[i]f two or more persons share the intention and power to exercise control, then each has possession").

¶ 26 Spencer was not in the Audi with the drugs when the car crossed into Illinois, and so he argues that the only evidence establishing his constructive possession of the drugs is the Mazda's proximity to the Audi when it was pulled over. Spencer has not provided us with any precedent showing that we should take his limited view of the evidence. The fact that Spencer was not charged with drug trafficking, or conspiracy, does not affect our analysis. Spencer was not charged in Illinois for actions he took in Arizona, but those actions are certainly relevant to his Illinois charges. We are not required to ignore evidence of things Spencer did and said before that moment, or in other jurisdictions, to evaluate whether he possessed the drugs in Illinois.

¶ 27 Force's testimony, coupled with the physical evidence supporting the details of that story, show that Spencer did, in fact, have the intent and capability to maintain control and dominion over the drugs. Most damningly, he provided his own Audi (with the "trap" already built in) for transporting the money from Illinois to Arizona and transporting the drugs from Arizona to Illinois. He and Morales accompanied Force on the journey to Arizona, and Spencer himself paid for hotel rooms along the way. He and Morales purchased and packaged the drugs in Arizona, hiding them in the trap. *Pittman*, 2014 IL App (1st) 123499, ¶ 37 (defendant who hid packets of drugs did not have actual possession, but "careful hiding of the drugs circumstantially evidenced his intent and capability to return later and only then exercise actual control"). He followed Force in the Mazda and maintained communication with him through Morales, right up until the traffic stop.

¶ 28 Evidence in the Mazda showed Morales had rented it from Midway airport just before the journey, Spencer had paid for hotel rooms in New Mexico, and all three men were in Tucson during the time Force described. Further, a surveillance video showed the three men at that New Mexico hotel. From this evidence, a reasonable juror could conclude that Spencer and Morales shared the intent to control the drugs, so they had joint constructive possession, and Force was merely their courier, even though Force was driving the Audi and had access to the drugs. *Pittman*, 2014 IL App (1st) 123499, ¶ 43.

¶ 29    Moreover, Spencer cannot escape responsibility by pushing it onto Morales and Force. Spencer's guilt can be established through his accountability for their actions. Legal accountability for another's conduct arises when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2008). The State must present evidence that establishes the defendant shared the criminal intent of the principal or the existence of a common criminal design. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 52. If two persons engage in a common criminal design, any acts in furtherance of that design committed by one of them becomes an act of all, and all are equally responsible for the consequences. *Id.* A common design may be inferred from the circumstances surrounding the crime. *Id.* Again, a reasonable juror could conclude—both through Force's testimony and the physical evidence showing Spencer and Morales's presence on the trip, supporting the details of Force's testimony—that Spencer, Morales, and Force all shared a common criminal design to buy drugs in Arizona and transport them to Illinois. Thus, Spencer is accountable for Morales and Force.

¶ 30    Much of Spencer's argument relies on downplaying or outright ignoring Force's testimony. As Spencer repeatedly pointed out, Force was himself a drug dealer testifying under a plea agreement. But, through cross-examination, these deficiencies were raised, and it is the jury's province to determine witness credibility. *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 82. We will not reverse simply because Spencer claims that Force was not credible. *People v. Pena*, 2014 IL App (1st) 120586, ¶ 18.

¶ 31                              Admission of Metal Piece

¶ 32    Spencer next claims that the trial court erred in admitting the piece of metal found in the Mazda, described by Agent Malloy as being similar in dimension to the opening of the trap hiding the drugs. As an initial matter, we reject the State's contention that this claim can be reviewed only for plain error. Contrary to the State's representations, Spencer's counsel contemporaneously objected to the admission of the piece of metal and included the issue in his posttrial motion.

¶ 33    Even if the trial court erred in admitting the piece of metal into evidence and allowing Agent Malloy to testify that it was of similar dimensions to the trap opening, we find that the error was harmless. Indeed, Spencer's complaint—that there was insufficient proof the piece of metal came from the Mazda—illustrated its lack of impact on the case. This piece of evidence was minor in importance, compared to the other, more convincing physical evidence connecting Spencer to the drugs (particularly Spencer's connection to the Audi, the hotel receipt in Spencer's name, and the surveillance video showing him in the hotel with Force and Morales). These pieces of physical evidence shored up Force's story, which was the main evidence against both Spencer and Morales. We are confident that the admission of the metal piece and Malloy's brief testimony about its dimensions, did not affect the conviction. See *People v. Goins*, 2013 IL App (1st) 113201, ¶ 72 (in assessing whether error is harmless, court should ask whether harm complained of contributed to defendant's conviction).

¶ 34                    Admission of Coconspirator Statements

¶ 35    Spencer next argues that the trial court erred in admitting his statements to Force under the coconspirator exception to the hearsay rule. Under that rule, a statement is not hearsay if "[t]he statement is offered against a party and is *** a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Ill. R. Evid. 801(d)(2)(E) (eff. Jan. 1, 2011); see also *People v. Kliner*, 185 Ill. 2d 81, 141 (1998). The existence of the conspiracy need not be proved by direct evidence (*People v. Leak*, 398 Ill. App. 3d 798, 826 (2010)), but it must be shown independent of the hearsay statements themselves. *People v. Cook*, 352 Ill. App. 3d 108, 125 (2004). This rule still applies even though Spencer and Morales were not charged with conspiracy. *People v. Coleman*, 399 Ill. App. 3d 1198, 1203 (2010).

¶ 36    Spencer argues that the only evidence of the conspiracy came from Force himself. Not so. Independent evidence may be circumstantial because conspiracies tend to be clandestine. *Leak*, 398 Ill. App. 3d at 826. The physical evidence—particularly the use of Spencer's Audi, the video showing Spencer with Force in New Mexico (at the time specified by Force during their journey to buy the drugs), and Morales's rental of the Mazda—presents circumstantial, but damning, evidence showing the existence of the conspiracy between the three men. See, *e.g.*, *Coleman*, 399 Ill. App. 3d at 1202-03 (sufficient evidence to admit coconspirator statements where Coleman was arrested with codefendant after drug sales, Coleman had piece of paper with price of drugs written on it, and Coleman lied to police). The trial court did not err in admitting these statements under the coconspirator rule.


¶ 37                              Excessive Sentence

¶ 38    Spencer argues that his 25-year sentence is excessive due to Spencer's advanced age (47 years) and the shorter sentences given to Force and Morales. A reviewing court may only reduce a sentence when the record shows that the trial court abused its discretion. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). The reviewing court may not reverse the sentencing court just because it may have weighed the relevant factors differently. *Id.* The trial court considers all factors in mitigation and aggravation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). We presume a trial court evaluates the relevant factors in mitigation before it, and that presumption cannot be overcome without affirmative evidence of the sentencing court's failure to do so. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010).

¶ 39    We do not believe the trial court abused its discretion. The record showed that the trial court considered all the evidence brought before it (including Spencer's age) and weighed the factors, including his extensive criminal history and failure to comply with bond conditions. As to his codefendants, Force received a lesser sentence because he pleaded guilty to a lesser charge in exchange for his testimony and Morales had no criminal history.

¶ 40    Finally, Spencer argues that he would have received a lower sentence if convicted under federal law. While interesting, it is irrelevant to whether the trial court abused its discretion under Illinois law.

¶ 41    Spencer was subject to a range of 15 to 60 years for his conviction. His sentence was in the lower end of that range, even with his extensive criminal history. Where the trial court contemplated all the relevant factors, we will not reweigh the evidence. *People v. Snyder*, 2011 IL 111382, ¶ 36 (reviewing court gives substantial deference to trial court's sentencing decision because trial judge, having observed defendant and proceedings, is in much better position to weigh defendant's credibility, demeanor, moral character, mentality, environment,

habits, and age).

¶ 42                    Ineffective Assistance of Counsel

¶ 43        Finally, Spencer argues that his trial counsel was ineffective for failing to move to quash his arrest for lack of probable cause and suppress the evidence seized from the Mazda following that arrest. The State correctly points out that there is little in the record about why the police arrested Spencer; without this information, we cannot tell whether it was sufficient to constitute probable cause for the arrest and thus cannot tell whether a motion to quash the arrest would have been successful. Spencer acknowledges that this claim can be raised in postconviction, and we think that would be better practice here. Thus, we decline to rule on the issue. Spencer may raise the issue in a postconviction petition if he so desires. See *People v. Moore*, 402 Ill. App. 3d 143, 145-46 (2010) (matters outside record may not be raised on appeal; postconviction claim that relies on such matters is not forfeited).

¶ 44        Spencer has also argued that, if the evidence in the Mazda were suppressed, it would affect the analysis of the metal piece and the coconspirator statements. Because we decline to address the ineffective-assistance claim, we have evaluated the coconspirator-statements and metal piece claims in light of all of the evidence, including the evidence from the Mazda.

¶ 45        Affirmed.